MARTHA HELEN FELIX, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 18960

FRANCISCO J. ONTIVEROS, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 19191

March 18, 1993 849 P.2d 220

*Martillaro & Martillaro, Nielsen & Walker,* Carson City, *Peter L. Flangas,* Las Vegas, for Appellants.

*Frankie Sue Del Papa,* Attorney General, *Noel S. Waters,* District Attorney, Carson City, for Respondent.

*Annabelle Whiting Hall,* Reno, for Amicus Curiae.

156

## OPINION[1]

*Per Curiam:*

The appellants, Martha Helen Felix (Felix) and Francisco J. Ontiveros (Ontiveros), appeal their convictions for sexual assault of children entered against them after a jury trial. The numerous sexual assaults were alleged to have been committed on children attending a day care center in Carson City, Nevada. Felix was convicted of three counts of sexual assault of a person under fourteen years of age and Ontiveros of one count. Both received the maximum sentence permitted under the law. For the reasons expressed in this opinion, we reverse their convictions.

By determining that errors were made by the justice of the peace and the district court judge, some may infer that we are critical of these judicial officers. This is untrue. While we believe the law requires the reversal of these convictions, most of the authority compelling this result was established subsequent to the conclusion of this very difficult and complex trial. Throughout the proceedings, the justice of the peace and the district court judge were competent, hard-working, and accommodating.

### INTRODUCTION

This case began in 1984 when one child, Susan Y., in response

---

[1]We have determined that consolidation of these two appeals for purposes of disposition is appropriate.

to her mother's questioning, indicated that she had been sexually molested at least two and one-half years previously at a day care center owned by Felix and where Ontiveros, a relative, occasionally worked. Felix is often referred to as Martha and Ontiveros as Paco. Susan was six years old when she made these accusations against appellants. Susan's mother took her to psychologist Joanne Fisher (Fisher) who reported her suspicions of sexual abuse/molestation to the police. Thus began the most extensive and costly criminal investigation and prosecution in Carson City history.

This investigation began in the wake of two other highly publicized cases involving allegations of child molestation and abuse at children's day care centers, the *McMartin* case in California and the Montessori case in Reno, Nevada.[2] Believing they were facing another case of widespread sexual assault and molestation at a day care center, the Carson City Sheriff's Office contacted the parents of the children who had attended Felix's day care center, informed them of the allegations made by Susan Y., and requested that they question their children or take them to a child therapist or psychologist for questioning. The State assisted in arranging for a psychologist to interview the children if their parents so requested. The investigation eventually involved allegations that as many as nineteen children had been assaulted.

Patricia L. was between three and one-half and five years old when she attended Felix's home day care center. Patricia did not attend regularly, but rather one or two times a week. She never complained of abuse until she was interviewed by psychologist Patricia Bay (Bay) when she was six years old. Like Susan, Patricia first denied that any abuse had taken place. After several interviews with Bay, Patricia made a few accusatory statements in response to leading questions. Subsequently, she again denied that any child sexual assault (CSA) had occurred.

The principal psychologists who interviewed the girls initially were working primarily to assist the police in their investigation and to confirm that a sexual assault had occurred. Most of these interviews were not recorded. As these interviews progressed, the children began to report incredible stories, such as the killing and burying of people and animals in Felix's backyard. Law

---

[2]The *McMartin* case began in 1982 with the investigation of suspected molestation at a day care center in Manhattan Beach, California. The case received much publicity and resulted in all but one of the defendants being acquitted. The civil cases resulting from these indictments are Satz v. Supreme Court (McMartin), 225 Cal.App.3d 1525 (1990), and McMartin v. Children's Institute Intern., 212 Cal.App.3d 1393 (1989), *cert. denied,* 494 U.S. 1057 (1990). The Montessori day care center case investigation in Reno, Nevada, began in 1984 and reached this court prior to trial. State v. Babayan, 106 Nev. 155, 787 P.2d 805 (1990).

enforcement officers dug up the backyard and what was believed to be the location of a hillside graveyard outside of town, but found no evidence to support the children's accusations.

The trial in these consolidated companion cases involved twenty-one counts of criminal violations allegedly committed against nine child-victims. Appellants were acquitted on seventeen of the twenty-one counts of CSA. They appeal their convictions of four counts involving two victims, Susan Y. and Patricia L. Ontiveros was convicted of one count of inserting his finger and/or knife into Susan's vagina. Felix was convicted on three counts consisting of: (1) inserting her finger or an unknown object into Patricia's anus; (2) inserting her finger or an unknown object into Patricia's vagina; and (3) inserting her finger into Susan's vagina.

Subsequent to trial, a number of cases were decided by the United States Supreme Court determining the limits which can be placed on a defendant's United States Constitutional right to confront the witnesses against him (Coy v. Iowa, 487 U.S. 1012 (1988); Maryland v. Craig, 497 U.S. 836 (1990)), and the requirements for assessing the reliability of a child's accusatory hearsay statements made against a defendant before their admission into evidence (Idaho v. Wright, 497 U.S. 805, 819-22 (1990); White v. Illinois, _____ U.S. _____, 112 S.Ct. 736, 742-43 (1992)). These cases force us to examine their effect on NRS 51.385, our statute permitting a child's accusatory hearsay statements of sexual assault, and on NRS 174.229, which permits a videotape of a child's preliminary examination testimony concerning sexual assault to be received into evidence. These United States Supreme Court cases and NRS 51.385 compel us to reverse the convictions entered against Felix and Ontiveros.

Further, we conclude that an insufficient showing was made to determine that either Patricia or Susan were competent to testify about the events that occurred at Felix's day care center. Patricia made her accusatory statements to psychologist Bay during two of the ninety-eight interviews she had with Bay and after being subjected to substantial leading questions. She never made these accusations to her parents, and she repudiated them subsequently. Patricia never testified at any of the court proceedings. Faced with such equivocal testimony, the district court should have interviewed Patricia in chambers before determining that she was competent but unable to testify. By finding her competent to testify, Patricia's out-of-court accusatory statements were received into evidence, but finding her unable to testify resulted in the appellants not being able to cross-examine her.

Almost all of the events described in Susan's testimony as

occurring at Felix's day care center were false or incredible. The undisputed medical evidence established that most of the assaults Susan alleged could not have happened. Her testimony that animals and people were killed and buried at the day care center is incredible, as was her testimony of being hung by her neck in a closet for hours and being forced to drink gasoline and dog urine. The events she described that occurred at the day care center appear to be .more fantasy than fact, and therefore it was not proven that she possessed the capacity to receive just impressions of events that occurred at the day care center and the ability to relate them truthfully.

## FACTS

### Preliminary Hearing

The justice court conducted a month-long preliminary hearing. The State videotaped this hearing with the intention of showing the videotape at trial, relying upon statutes enacted in 1985 to facilitate the prosecution of CSA cases: (1) NRS 51.385, which authorizes the admission of children's hearsay statements about CSA, and (2) NRS 174.227[3] and 174.229, which authorize the use of videotaped testimony of child-victims in CSA cases.

At the hearing, the court granted the State's motion to exclude the appellants from the courtroom in order to protect the child witnesses who testified. No affidavits or evidence of any type was presented to support the State's oral motion to bar the appellants from the courtroom to protect the child witnesses. The justice court made no finding that the appellants' exclusion from the courtroom was necessary to protect the children. Defense counsel for appellants remained in the courtroom where they could cross-examine the witnesses. Felix and Ontiveros were permitted to view the proceedings via a one-way video and could communicate with counsel. At the hearing, the State presented testimony from children, parents, doctors, psychologists, and police detectives, which supported the allegations of CSA. Susan testified at the hearing, but Patricia did not. The court concluded there was sufficient evidence to bind appellants over for trial in the district court on twenty-one counts. However, the court did not assess the

---

[3]Although the State argues that both statutes permit the introduction of the videotapes of CSA victims, NRS 174.227 deals exclusively with depositions of minors and NRS 174.229 concerns only videotapes of preliminary hearing testimony. The videotapes introduced into evidence at trial concerned two general subjects: (1) the videotaped testimony of four children at the preliminary hearing, and (2) the numerous videotapes of psychologists interviewing the children. No videotaped depositions contemplated by NRS 174.227 were taken. Therefore our analysis of the statutes does not include NRS 174.227.

reliability of the child-declarants' hearsay statements introduced at the preliminary hearing, as required by NRS 51.385,[4] and did not rule whether any of the children who did not testify, whose hearsay statements were introduced, were legally unavailable.

At the hearing, Susan testified that Ontiveros and Felix did bad things to her and stuck a knitting needle up her crotch. When asked who actually stuck the needle in her, she said that Ontiveros did it and that he also stuck his penis in her crotch. Susan was emphatic that no one else touched her at the day care center. Hearsay accusations made by Susan were testified to by several adults, thereby providing evidence implicating Felix. The evidence involving the counts concerning Patricia was presented exclusively by the testimony of adults repeating Patricia's hearsay accusations.

After the hearing, appellants petitioned the district court for writs of habeas corpus claiming they were illegally confined. They argued that their exclusion from the courtroom and the State's use of hearsay testimony violated the Confrontation Clause of the Sixth Amendment. The district court denied the petitions.

## Pretrial Competency Hearing

After the preliminary hearing but before trial, the district court conducted competency hearings to determine whether the child witnesses were competent to testify. The court initially limited the scope of the hearings to issues of competency, but later decided to rule on the reliability and admissibility of the hearsay statements that the State intended to offer.

Appellants' primary challenge to the competency of Susan and Patricia to testify and the reliability of their accusations was that the children were too young to have any clear or reliable recollection of what occurred at the day care center. And, if they did have

---

[4]NRS 51.385, which includes the heading of "Statement of Child Describing Sexual Conduct," states:

Admissibility; notice of unavailability or inability of child to testify.
1. In addition to any other provision for admissibility made by statute or rule of court, a statement made by a child under the age of 10 years describing any act of sexual conduct performed with or on the child is admissible in a criminal proceeding regarding that sexual conduct if the:
(a) Court finds, in a hearing out of the presence of the jury, that the time, content and circumstances of the statement provide sufficient circumstantial guarantees of trustworthiness; and
(b) Child either testifies at the proceeding or is unavailable or unable to testify.
2. If the child is unavailable or unable to testify, written notice must be given to the defendant at least 10 days before the trial of the prosecution's intention to offer the statement in evidence.

any independent recollections, they were irreparably altered by the coercive and suggestive interviewing of the police and psychologists.

The expert for the defense was Dr. Lee Coleman, a practicing psychiatrist who specialized in the investigation and treatment of CSA. After reviewing all of the children's videotapes and transcripts of the audio interviews with them, he found fundamental errors in the investigation techniques. First, Dr. Coleman strongly objected to the assumption by the police and psychologists who interviewed the children that sexual abuse or something very bad had taken place. He was especially critical of the psychologists' practice of not accepting the children's denials that something had happened, and of the repetition of questions to which an affirmative answer was sought. He thought it highly probable the children had learned a great deal by the psychologists' questioning and stated:

> And in my opinion the explanation of why children are saying these things has been presented to the court right on these tapes. It's coming from the interviewers who have got these ideas so firmly planted in their mind that they are transmitting to the children.

Dr. Coleman believed this transmission occurred by the psychologists giving the children the impression that something bad had happened at the day care center and the interviewers then indicating they would be pleased if the children would recite or confirm such information. In his criticism of the interviewing techniques used by Patricia's psychologist, Dr. Coleman explained:

> I can't think of a worse way to do it than this, because what basically the message they're giving to the child is when you tell us something bad happened we will believe you and we will praise you. When you say it didn't happen we will doubt you, we will ask whether or not you were afraid to tell us or whether you were threatened into not telling us, and we will keep on asking you and we will let you know that until you tell us that it did happen we will keep after you.

Concerning the coercive and suggestive questioning techniques, Dr. Coleman stated:

> [A] child can end up with a mental picture of all kinds of things having happened that didn't happen. And what's terribly important is sincerely believing in those events just as much as if they did happen, and terribly important as well is reacting emotionally and in a harmful way just as much as if they did happen.

Because of the lack of spontaneity by the children in reporting these incidents, the time between the events and their disclosure, and what he considered to be the coercive and suggestive interviewing techniques, Dr. Coleman concluded that it was highly questionable whether Susan and Patricia could differentiate between what they remembered and what the psychologists had suggested. With regard to Patricia, Dr. Coleman concluded that her testimony was rendered totally incompetent by the improper interviewing techniques. With regard to Susan, he stated that because of her young age when at the day care center, and because of the contamination of improper questioning, she would be unable to distinguish between what she actually remembered and what she learned through the interviewing process.

The State countered Dr. Coleman's testimony with that of Dr. Roland Summit, a child psychiatrist. Although he acknowledged that the investigation was not ideal and some of the questioning of the children was suggestive, he did not believe the children's independent recollection of events at the day care center had been irreparably damaged. He stated that it has not been well established that a child can be made to believe something happened that actually did not by suggestive and repetitive questioning. He stated:

> The assumption that children can be moved into believing that they have experienced a complex and traumatic set of circumstances because of leading questions or repeated interviews or the suggestions from important people, that's not well established in any empiric data or data.

Dr. Samantha Payne, the psychologist who interviewed Susan after psychologist Fisher had questioned her a number of times, stated that Susan was competent to testify and was not fantasizing about the events to which she testified.

Shortly before trial, the district court heard argument concerning the competence of the child-victims to testify and the trustworthiness of their hearsay statements. It was clear that the court was actually determining competence, whether the children were capable of telling the truth, not whether their hearsay statements were affirmatively reliable. In making its ruling concerning Susan, the court stated:

> Now, first of all, my decision is not—I want everybody to understand, I don't express any opinion as to whether the child is telling the truth or not. That's not my decision. My decision is that, is the child capable of telling the truth, not is the child telling the truth.

The court stressed that it would leave veracity and reliability to the jury:

The next question is, has she been so manipulated or exposed or maneuvered so her competency has been destroyed? And, as a matter of law, I can't say she has. She had some very unusual and strange things to relate. Whether they are true or not is a question of fact that a jury is uniquely capable of discovering. . . .

. . . .

. . . So Susan . . . will be allowed to testify, both as to today's events and her testimony to third persons, including her mother and others, will be admitted into evidence.

The court did not immediately announce its decision with regard to Patricia's competence or the reliability of her hearsay statements, but subsequently found that Patricia was competent to testify and that her accusatory hearsay statements would be admitted into evidence.

The district court then issued an order entitled "Order Concerning Competency of Certain Minor Children" in which it considered the truthfulness of the children's statements as well as the children's competence to testify. The court found Susan competent to testify, even though she was very young when she attended the day care center. The court then made a blanket ruling as to the trustworthiness of Susan's hearsay statements:

[T]his Court cannot say that the child's recollections have been contaminated by intervening interviews with parents, therapists or police officers. Assertions of suggestive questioning and coaching brought by the Defense expert, Dr. Lee Coleman, are not clearly established by the record. The testimony of the child concerning unusual occurrences at the FELIX residence will be admitted. The extent to which such testimony is childhood fantasy, a product of the child's fear and terror, the result of uncritical interviewing or founded in reality are matters going to the weight, not the admissibility, of the evidence.

The district court also found that Patricia was competent to testify and that her testimony was not made inherently unreliable by the suggestive interviewing techniques.

I find that Patricia was legally competent at the time of the alleged events, at the time of disclosure, and that the interviewing methodology was not, as a matter of law, so suggestive or coached as to make her statements inherently unreliable. Whether she is available and able to testify or perhaps made incompetent now because of mental problems, will have to be determined at the appropriate place in trial.

The appellants made continuing objections to the receipt of the

164

children's hearsay statements pursuant to NRS 51.385, the court accepted such objections, and the State admits this fact on appeal.

## Summary of Trial

The trial lasted from September, 1987, to February, 1988. The State did not seek to exclude the appellants from the courtroom. The primary evidence presented by the prosecution consisted of: (1) testimony of some of the children; (2) testimony of parents, psychologists, police, and a doctor recounting hearsay statements in which the children implicated appellants; (3) videotapes of children's accusatory statements made during therapists' and psychologists' interviews; (4) videotapes of preliminary hearing testimony of some children; and (5) testimony of several physicians regarding physical evidence of CSA.

At trial, Susan testified to all of the acts for which appellants were convicted. After she finished testifying, however, the State introduced hearsay testimony from others recounting accusatory statements that Susan had made to them but to which Susan had not testified at trial.

Patricial did not testify at any phase of the proceedings, and she was never seen nor examined by the district court. Therefore, the convictions regarding Patricia stemmed from Patricia's statements as reported by others.

Several of the children's parents recounted hearsay statements that their children had made regarding the CSA. Those parents were called to the stand after their child had been excused, and the children were never recalled. Thus, the defense was unable to cross-examine many children about statements that they allegedly made to their parents. For example, two children, Jacob and Amanda, refused to make any accusations of CSA at trial. However, their parents subsequently testified and recounted their versions of what their children had said.

All testifying physicians agreed that none of the nine children involved in the counts charged at trial was subjected to full penile penetration. However, two physicians testified that Patricia and Susan displayed physical evidence of CSA consistent with penetration by a blunt object. The physician testifying for the defense disputed this evidence, stating that the medical evidence was inconclusive.

Dr. Lee Coleman, the defense psychiatrist, again testified in some detail concerning the techniques used in interviewing the children. He stated his opinion that the principal interviewing psychologists had used grossly leading and suggestive techniques which rendered unreliable the children's statements and memories of the events at the Felix home.

Four times during the trial the State played videotapes of four

of the children's preliminary hearing testimony. The videotape of Susan's preliminary hearing testimony was proffered about two weeks after her trial testimony. The videotape showed Susan stating that Paco had stuck his penis and a knitting needle in her crotch. The defense objected to the videotape, noting that Susan had not testified about a knitting needle at trial and that the defense had no opportunity to cross-examine on this point. The objection was overruled.

The State planned to introduce numerous videotapes of the psychologists interviewing the children and the children making accusatory statements against the appellants during the interviews. The appellants were initially opposed to the introduction of these videotaped interviews. However, after the court ruled that all of the accusatory hearsay statements made by Patricia and Susan were not unreliable and would be admitted into evidence, the defense changed its strategy and did not oppose the admission of these videotapes. This was because the defense believed that the best way to attack the wholesale admission of the children's accusatory hearsay statements was to show on the videotapes that the psychologists' interviewing techniques were fatally flawed and that any responses from the children were unreliable. Psychologist Patricia Bay (Bay) had interviewed Patricia extensively, and the one session she had videotaped was shown during trial to the jury. Interviews with Susan conducted by psychologists Fisher and Payne were also shown.

### Trial Testimony Concerning Susan Y.

Susan attended the day care center for about one year between the age of two and one-half and three and one-half. Her first accusations were made two and one-half years after she last attended the day care center. On direct examination, Susan said that Ontiveros put his penis in her while Felix took pictures, that Paco put a brown knife up her crotch, that Paco put his finger in her crotch, and that Martha put her fingernail in her crotch. Susan's responses were quick, brief answers. She could not give a lot of detail about the various incidents. An example of her responses was her answer to the query about what she did not like about Martha's home. Her response was, "Like Paco sticking his penis in me." She stated that it happened in Martha's bedroom, but the time, day, month, or year was not elicited by the prosecutor. Susan did not remember how Paco was clothed and initially could not remember the position she was in when she said she was accosted. Susan stated that it happened a lot of times, and on cross-examination she remembered she was standing when these incidents occurred.

Susan claimed that Paco also put her in the bathtub undressed

and held her head under water until she passed out. When asked what else happened to her in the bathroom, she answered:

A. Paco sticking a knife up my crotch.
Q. That was in the bathroom?
A. Yes.
Q. What did the knife look like?
A. It had a brown, it was a short knife with a brown handle and a silver blade.
Q. Do you remember anything else about it?
A. No.
Q. Did that take place on more than one time?
A. Yes.
Q. How often?
A. Lots of times.

Again, no time, day, month, or year was established by this or other witnesses. Susan stated that she bled when this happened, but Martha would wipe the blood off her leg or wash her underpants. Her mother never noticed any blood on her pants. When asked if anything else was inserted in her crotch, she answered, "Martha's fingernail," and described the nail as being long and pointed with fingernail polish on it. No other details concerning this incident were elicited by the prosecutor.

Susan's accusatory statements were interspersed with tales of bizarre and incredible events that she claimed occurred at the day care center. She testified that Paco and Martha killed animals in the backyard of the day care center to scare her. She remembered pigs, goats, calves, and horses being slaughtered. She had a specific recollection of a calf being killed by Paco and Martha by slitting its throat and the blood from it drained into a big container. She stated that the children were forced to drink the blood. A large hole was then dug and the calf was buried in the backyard.

Susan also testified that some of the larger animals were buried on the hill outside of town. On cross-examination, she related in some detail how she went with Paco and Martha to pick up a horse and take it to this hill where it was killed. Again, she said she was forced to drink the horse's blood and the horse was then buried in a large hole.

Susan testified that Martha and Paco made Adam, her brother, who was five years old at the time, stick his penis in her butt, and made her kiss her brother's penis. The children were than forced to "eat dog poop . . . and drink dog pee."

In Susan's testimony during the proceedings, she also claimed that she was taped up and hung by her neck in the closet, that her eyebrows were plucked out, and that pictures were taken of her in

the nude when she was outside. In addition to being forced to drink animals' blood, she testified to having been forced to drink chlorine and gasoline. She also testified that a family of four was at the day care center and that they were tricked into walking into the backyard, where they were killed and buried.

Dorothy Y., Susan's mother, recounted Susan's first accusatory statements, which were the genesis of this case. Ms. Y. testified to the following: Two years before trial, when Susan was six years old, Susan found a doll Martha had made for Susan, and Susan said, "I really hated it there. I really hated Paco." She testified that Susan said Paco would sit on her and pull her eyebrows. She took Susan back to the bedroom and asked her, "Can you tell me anything else, honey? Did he ever show his penis to you?" Susan said no. Some days later, when watching a swimsuit contest on television, Susan said, "I guess it's okay to take pictures like that with your clothes on." Ms. Y. again took Susan to the bedroom and asked her if she had ever seen pictures like that. Susan said yes, that Felix and Ontiveros had taken pictures of her like that without her clothes on. Then Susan said, "And know what else they did, Mom? He stuck his penis in me." Ms. Y. testified that when she asked Susan why she had not said anything before, Susan said Paco and Martha had told her they would kill her if she told anyone.

Ms. Y. also testified that Susan made the following statements, none of which Susan testified to in court: Susan had been punished at Martha's house with a "stinging stick," and Paco had put a pen up her vagina. She also recounted statements similar to Susan's statements on direct examination.

Ms. Y. had testified at the preliminary hearing that Susan informed her that Paco stuck his penis in her crotch after Susan had been seeing psychologist Fisher. However, Ms. Y. recanted this testimony at trial. Ms. Y.'s preliminary hearing testimony was consistent with psychologist Fisher's testimony that Ms. Y. did not indicate Susan had been assaulted when she began treating Susan, and that Ms. Y.'s complaints were only that Susan was having nightmares and not sleeping well.

Fisher testified that in her first session with Susan, Susan told her that Paco put his penis in her. Over defense objection, Fisher was permitted to state her opinion that Susan's statements were not the product of fantasy "because she is more concrete and a forthright-type person." About a month and several interviews later, Fisher called the Carson City authorities, and Detective Sue Coffey began investigating. Coffey, who was not a psychologist, testified that she sat in on some of the sessions, and she remembered that Susan had recounted the basic allegations of CSA and told her that animals had been slaughtered in Martha's backyard.

Samantha Payne, a board-certified psychologist, was asked by the State to interview Susan and Adam Y. in cooperation with Detective Coffey. Detective Coffey explained that she recommended Payne primarily to secure the best incriminating statements from Susan and to provide a better credentialed expert for testimony at trial. Payne's first three visits with Susan and Adam were paid for by the sheriff's office and were to secure information, not therapy. Payne testified at trial that, immediately after she videotaped the first session with Susan, Susan told her that Paco put his finger in her "vagina." She interviewed Susan twenty-nine times, but only the first interview was recorded. Her videotaped interview with Susan was shown to the jury. Payne also said Susan told her that Martha had put her finger inside Susan's vagina and that Paco had put a knitting needle in her vagina.

Susan was taken to Dr. Tom Scully, a pediatrician, by Detective Coffey and Ms. Y. Dr. Scully's examination disclosed a five by seven millimeter opening in the hymenal ring, and he explained that a pencil point is about a millimeter. He opined that his findings were consistent with a blunt force penetration of Susan's vagina. However, he indicated that it was not consistent with full penile penetration, nor with a knife or other sharp object.

Dr. Scully found Susan reticent, but asked her, "Did someone touch you?" She answered, "Yes," and she pointed to her vaginal area. Dr. Scully then asked if it was a man, and she again responded in the affirmative. He then asked Susan the man's name, and she said Paco.

Dr. Roland Miller, head of the Department of Obstetrics, Gynecology and Pediatrics at the University of California Irvine Medical School, examined Dr. Scully's findings and said that Susan's examination was not conclusive of sexual assault or penetration. He stated that a four millimeter opening in the hymenal ring is considered normal, and that an opening three millimeters larger is not a great variation. He indicated that such an opening could be caused by several other factors.

### Testimony Regarding Patricia L.'s
### Inability to Testify at Trial

Patricia L. did not testify at trial because, according to her psychologist, Patricia Bay of Children's Protective Services, she would suffer long-term psychological trauma if she did testify. Bay is a practicing marriage and family therapist with a master's degree in psychology.

Ms. Bay testified that Patricia would vacillate when asked if

she wanted to appear in court. Bay indicated that a week or so after Patricia was told she would have to testify, her behavior became aggressive and erratic and she hit a classmate without provocation. Bay attributes this conduct to Patricia being informed she had to testify. According to Bay, when Patricia was told that she would not have to testify, she seemed to settle down. But then she would indicate that she wanted to testify, and Bay would explain what would happen to her if she did testify.

> And we'd talk about it a little bit. And I'd say, "Well, let's pretend that you're going to testify for a minute and you're going to walk in the courtroom." I have a doll house courtroom and we would go and play with the courtroom and talk about how she'd walk in and where she'd sit and where all the participants would be.

Bay always told Patricia that Felix would be present since that is what Bay was told by the prosecuting attorney. The reason Patricia gave to Bay for not wanting to testify was that "[s]he didn't want to sit in front of Martha. She didn't want Martha to look at her."

The court accepted the testimony of Patricia's parents that they believed Patricia's testifying would have an adverse effect upon her, and the court also accepted Bay's prognosis of long-term trauma. The court ruled that Patricia would not be required to testify and that she would be considered unable to do so.

### Testimony Concerning Patricia L.

Patricia Bay became involved in the investigation, along with Detective Sergeant Harry Bishop of the Shasta County Sheriff's Department in Northern California, because Patricia L. and her siblings, Aaron and Noray Ann, had moved to Shasta County, California. Detective Coffey sent Bishop and Bay a report describing the strange allegations that were coming from the Carson City children, as well as peculiar traits that the children had in common. The report stated that many parents were told to discuss the allegations with their children.

Bishop interviewed Patricia and her siblings. Bishop testified that Patricia said nothing sexual had happened, but that she did not like it when Martha spanked her. Bishop also stated that several times Aaron told him that nothing had happened or that he could not remember any sexually related incident. Bishop later testified that, in response to persistent questioning, Aaron changed his statements and said that: (1) he saw Martha touch some clothed babies on private parts, which he identified by pointing to genital areas of dolls; and (2) Martha told him not to tell anyone or she would kill him.

Despite the district court's earlier ruling that Noray Ann's hearsay statements would be inadmissible because she was an incompetent witness, the prosecutor at trial specifically elicited her hearsay statements from Bishop. Noray Ann was about three and one-half years old when Bishop interviewed her, and she had been only ten months to twenty-six months old when at Felix's day care center. In response to leading questions, Noray Ann told Bishop that Martha "touched" her on the "bottom," which Noray Ann showed as the vagina and the anus by pointing to a doll. On cross-examination, Bishop conceded that Noray Ann had probably been in diapers, raising the possibility that Noray Ann's "touching" referred to changing diapers.

Patricia's brother, Aaron, testified at trial. Aaron was five and one-half to six and one-half years old when at Felix's and ten years old at the time of trial. Aaron said that Martha "touched" his sisters on the "rear end" with her hand and that Martha touched him and his sisters with a cattle prod. He explained that Bay supplied him with the term "cattle prod" after he described the incident. Aaron also said that Martha threatened to kill his parents if he told them of these incidents. However, three separate times he denied that Martha ever touched him in a sexual manner.

Overall, Aaron's testimony indicated that his memory was shaky. Many times he said that he did not recall an incident, but that it "probably" happened. He admitted that "probably" meant he was "guessing" these things happened. Also, he said Bay probably remembered things he did not because he had told Bay earlier and probably forgotten. Defense counsel also asked Aaron about Patricia's assertions that Martha prayed to Satan. Aaron said that Patricia sometimes lied. when defense counsel asked him why he at first denied that anything happened, Aaron said, "Patty Bay kind of tried to make me say something that didn't really happen." Later, Aaron spontaneously stated that he did not like Bay because she "sometimes . . . asked the same questions over and over." A transcript of Bay's interview with Aaron shows that almost all of her questions were leading.

Bay testified that she did not recall any specific disclosures by Patricia during the first interview attended by Sergeant Bishop. Bay said that she decided to interview Patricia again because Patricia appeared nervous, and because she later learned that a Dr. Pugno found medical evidence of CSA when he examined Patricia. In the second interview, Bay said that Patricia told her, "Martha hurt me" and pointed to her vagina. However, Bay could not remember if the statement was spontaneous. In the third interview, Bay said she told Patricia that Aaron had said Martha did "things" to Patricia, and Patricia responded by making

allegations that Martha touched her in private places. However, Bay admitted that all of Patricia's incriminating statements were given in response to leading questions.

Bay played a game with the children called "complete the sentence." For example: Bay said, "Martha used blood to . . . ," and Patricia said "cut you" to complete the sentence. Bay said, "Martha thought animals were . . . ," and Patricia said, "Killed them with a gun." Bay said, "Martha used gasoline to . . . ," and Patricia said, "For the car." Bay said, "The worst thing Martha did was . . . ," and Patricia said, "Touch kids in their private parts." Bay testified that during this game, Patricia said, "Martha killed a bird. She killed a cat and scared us with the blood." Bay said she asked about the gasoline because the children had somehow mentioned it before. Prior to the interview in which the game was played, Ms. L., Patricia and Aaron's mother, told Bay that Aaron had said Martha killed a little girl. When Aaron denied having said this, Bay stated, "Well, your mom said that the other day you told her that Martha killed a little girl."

Bay testified that, at a subsequent interview, Patricia said she saw Martha put her finger in another child's vagina. In the interview, Bay then started to use anatomically correct dolls in questioning Patricia, and Bay let Patricia draw pictures. Patricia drew a picture of a knife and said it looked like the knife Martha had used to kill a calf, and that "[s]he killed it in the back yard with a knife and scared the kids with the blood." Bay further stated that Patricia said Aaron "put his finger in me and it hurt," and "Aaron put his finger in my vagina and then he washed it because it stinked." It is unclear whether the statements were in response to a leading question. At another interview, Bay asked, "Did Martha have a stick?" Patricia said, "Martha touched Aaron with a stick on both his legs. Aaron yelled." Bay said that Patricia recanted her disclosures of the previous day by saying, "No one ever touched me" and "Aaron never touched me."

By the time of trial, Bay had conducted a total of ninety-eight sessions with Patricia and her siblings. The cost of these sessions was largely paid from the Nevada Victims of Crime Fund. These sessions included twenty-two hours with Patricia alone. Most of the sessions were unrecorded, compelling the court to rely on Bay's memory to determine if her questions were suggestive or leading. Bay admitted that in the videotaped session, she did "suggest" or lead Patricia, but stated that the videotaped session was not representative of her usual unrecorded interviews. In Patricia's competency hearing testimony, Bay admitted that she tended to discount the children's denials, but that she did not question some of their more incredible stories. She admitted that Aaron could have picked up some information from Patricia

when the two children were interviewed together, and that she should have interviewed them separately to check for corroboration of their stories. She said she challenged the more incredible stories only "occasionally" and "mildly" by asking "Really?" or "Is that right?" When questioned why she asked the children whether they had seen Martha murder anyone, she said she could not remember.

At trial, Bay opined that Patricia was a victim of sexual assault and molestation. This opinion was based on medical findings, Patricia's statements, and Patricia's behavioral indicators in Bay's office and as reported by her parents. Bay cited the following behavioral indicators of CSA: (1) Patricia's fear of the bathtub; (2) her excessive masturbation; (3) her self-mutilation behaviors, such as biting and scratching herself; (4) her fear of sleeping alone; (5) her erratic mood swings; and (6) her aggressive behavior, such as cutting up her bed with scissors. Bay diagnosed Patricia as having "post-traumatic stress disorder, chronic and delayed," and she believed it was induced by sexual molestation and torture. She also concluded that Aaron was the victim of sexual assault and molestation.

Patricia's mother and father testified that their children made no allegations of sexual molestation. In fact, they admitted their children said nothing at all to them on the topic. However, they did testify to some non-sexually related statements their children made, such as that Martha killed animals.

Dr. Perry Pugno, a family practitioner from Redding, California, with substantial experience in examining children for evidence of CSA, examined Patricia. He found a seven millimeter opening in her hymenal ring and a two millimeter scar in her anal area. From these findings, he opined that Patricia had been vaginally penetrated by an object about the size of a finger and that her anus had been penetrated at least once. He concluded that it was unlikely Patricia experienced full adult penile penetration, but that it was possible the scarring could have been caused by someone with long fingernails.

However, Dr. Roland Miller testified for the defense that all of Patricia's physical signs were indicative of normal growth, and there were no indications of sexual molestation. Dr. Miller testified that it was common for female children to have hymenal openings the size of Patricia's from birth. It was Dr. Miller's opinion that Patricia had never been sexually penetrated.

## Trial Verdicts

On February 11, 1988, the jury acquitted Felix of thirteen of the sixteen counts against her. The jury acquitted Ontiveros of four of the five counts against him. In all, appellants were

convicted of four of the forty-two counts initially charged involving two of the fifteen children, Susan Y. and Patricia L. The district court sentenced Felix to three consecutive sentences of life with the possibility of parole, one for each count. Ontiveros received a sentence of life with the possibility of parole. Pursuant to NRS 200.366(2)(c), Ontiveros must serve at least ten calendar years before he becomes eligible for parole, and Felix must serve thirty calendar years before eligibility.

## LEGAL DISCUSSION

### I. *Competency of Child Witnesses: Susan Y. and Patricia L.*

Appellants raise a threshold contention that the district court erred in finding Susan and Patricia competent to testify. This court has concluded that a child is competent if he or she has the capacity to receive just impressions and possesses the ability to relate them truthfully. Lanoue v. State 99 Nev. 305, 307, 661 P.2d 874, 875 (1983) (competency determination held improper where trial testimony of five-year-old witness was not clear, relevant, and coherent and suggested a substantial amount of coaching). Although courts must evaluate a child's competency on a case-by-case basis, some relevant factors to be considered include: (1) the child's ability to receive and communicate information; (2) the spontaneity of the child's statements; (3) indications of "coaching" and "rehearsing;" (4) the child's ability to remember; (5) the child's ability to distinguish between truth and falsehood; and (6) the likelihood that the child will give inherently improbable or incoherent testimony.

The district court considered the children's competency as it existed at several different points in time, including the times of the alleged crimes, the times of the hearsay statements, and the time of trial. *See* Comment, *The Competency Requirement For the Child Victim of Sexual Abuse: Must We Abandon It?*, 40 U. Miami L. Rev. 245, 262 & n.75 (1985); *see also* State v. Justiniano, 740 P.2d 872, 875 n.4 (Wash.Ct.App. 1987). But even a finding of incompetency at trial (due, for example, to extreme nervousness) does not necessarily preclude the possibility that a child was competent at an earlier time. *Id.* at 874. And, conversely, a child may be generally competent to testify, but not specifically competent to testify about a criminal event that occurred years earlier. *See* Gov't of V.I. v. Riley, 750 F.Supp. 727 (D.V.I. 1990). The children's very young ages, the length of time between the alleged CSA and its disclosure, and the suggestive interviewing practices make the competency determinations difficult in this case.

174

*Competence of Susan Y.*

Susan was three years and five months old when she stopped attending the day care center, and she did not make any accusations against the appellants until two and one-half years later. She made general allegations of CSA, but her allegations were not always consistent. In her preliminary hearing testimony, she never stated that either Felix or Ontiveros stuck their fingers up her crotch; yet, she made such accusations at trial and both appellants were convicted for these acts.

At times, Susan indicated that Felix and Ontiveros did nothing to her or that others performed the CSA. Most of the CSA she testified to could not have occurred. The medical testimony uniformly established that Susan was not subject to full penile penetration or penetration by a knitting needle or knife. Yet, this is precisely what Susan testified to having occurred. Her testimony that she was hung in the closet for three hours by a rope around her neck and that her eyebrows were plucked out is not credible. Nor are her statements that people and animals were killed at Felix's and that she was forced to eat dog feces and drink dog urine and gasoline. When looking at Susan's sworn testimony, we find it more incredible than credible. The district court judge candidly stated that he was concerned about her fantastic observations. When a serious question is raised about a child's ability to recollect and relate truthfully what he or she observed, or the testimony is inherently improbable, the child's competence to testify about those events is seriously challenged. *See* Wilson v. State, 96 Nev. 422, 424, 610 P.2d 184, 186 (1980). Therefore, we can come to but one conclusion, and it is that Susan cannot differentiate between fact and fantasy when relating the events that occurred at Felix's day care center and should not have been found competent to testify to these facts.

*Competence of Patricia L.*

The record is replete with examples of coaching and coercive interviewing techniques that Patricia and her siblings received. Psychologist Bay interviewed the L. children ninety-eight times and spent twenty-two hours alone with Patricia. Patricia was also interviewed by other health care professionals and the police. Part of Patricia's psychological problems may well stem from the extraordinary number of interviews she underwent. Patricia never volunteered any incriminating information against Felix or Ontiveros. She made her cryptic allegations against them only after Bay asked her many leading questions, and Patricia made

her accusatory statements only during one or two of the numerous sessions. She subsequently recanted them. At no time, from the beginning of the interviewing process until trial, did Patricia tell her parents that Felix or Ontiveros had done anything improper to her. She was never subject to cross-examination.

Faced with such questionable evidence, the district court erred in finding Patricia competent to testify without conducting its own examination of her. We have previously indicated the importance of examining an alleged victim in CSA cases when determining competence to testify and have concluded that "to determine the competency of a child under 10 years of age the trial court must examine the child before permitting him to testify." Shuff v. State, 86 Nev. 736, 738-39, 476 P.2d 22, 24 (1970). Even if the child does not undergo questioning by the litigating attorneys, the court should have the opportunity to observe and interview the child if at all possible to make the threshold determination that he or she can receive impressions and relate them accurately. This examination can occur in chambers if necessary and need not cover the subject of sexual abuse. There is nothing in the record to suggest that Patricia could not have been produced and at least interviewed by the district court judge. And, it is best if a district judge explains to a child the mechanics of a trial, including who must be present in court. Because the district court did not examine Patricia and the record is replete with evidence of coaching and improper interviewing techniques, we hold that the district court abused its discretion in finding Patricia competent to testify.

## II. *The Confrontation Clause constraints on NRS 51.385 and NRS 174.229.*

NRS 51.385 authorizes the admission of out-of-court CSA allegations made by child-declarants whether or not they testify. If a child does testify, admission of that child's prior consistent or inconsistent out-of-court statements does not violate the defendant's constitutional right to confrontation, so long as the child is subject to full and effective cross-examination concerning the statements. *See* California v. Green, 339 U.S. 149 (1970) (admission of a witness's prior sworn testimony does not violate the Confrontation Clause, so long as he or she is produced and subject to full and effective cross-examination concerning that testimony). Although a witness's prior consistent out-of-court statements generally are inadmissible hearsay, *see* Daly v. State, 99 Nev. 564, 568-69, 665 P.2d 798, 802 (1983), such statements do not violate the Confrontation Clause. Therefore, even though NRS 51.385 may be in conflict with Nevada's prior consistent

statement rule, that exception causes no federal constitutional conflict. *See, e.g.*, Flewallen v. Faulkner, 677 F.2d 610 (7th Cir. 1982); State v. Webb, 779 P.2d 1108, 1112 (Utah 1989).

However, the Confrontation Clause becomes an issue when a child witness does not testify. If the court admits an absent child's statements that are not firmly rooted in a hearsay exception, the Confrontation Clause requires a showing that the hearsay statements bear particularized guarantees of trustworthiness such that cross-examination would be of little assistance in ensuring the reliability of the hearsay statements. *See* Idaho v. Wright, 497 U.S. 805, 826-27 (1990) (CSA conviction reversed because hearsay statements made by child and reported by physician did not bear adequate indicia of reliability); United States v. Inadi, 475 U.S. 387, 394, 399-400 (1986) (the Confrontation Clause does not require a showing of unavailability as a condition to admission of the out-of-court statements of a non-testifying co-conspirator).

NRS 51.385 addresses Confrontation Clause concerns by requiring findings of reliability of the hearsay statements and unavailability of the declarant whenever a child does not testify at trial. Similar statutes have been upheld when challenged on the same grounds. *See, e.g.*, State v. Leavitt, 758 P.2d 982 (Wash. 1988) (en banc); State v. Ryan, 691 P.2d 197 (Wash. 1984) (en banc); *see also* Myatt v. Hannigan, 910 F.2d 680 (10th Cir. 1990); State v. Diefenderfer, 784 P.2d 741 (Colo. 1988); State v. Wright, 751 S.W.2d 48 (Mo. 1988) (en banc); State v. Gallagher, 554 A.2d 221 (Vt. 1988); State v. Belloti, 383 N.W.2d 308 (Minn.Ct.App. 1986).

NRS 174.229, the statutory provision addressing videotaped preliminary hearing testimony, may raise a Confrontation Clause dilemma when applied to a specific case.[5] First, NRS 174.229 does not require witness unavailability before videotaped testimony given at a preliminary hearing may be used in lieu of a child's testimony at trial. However, when prior testimony is used in lieu of live testimony, the declarant must be unavailable, even though the declarant's statement was made under oath and the declarant was subject to cross-examination. Ohio v. Roberts, 448

---

[5]NRS 174.229 states:

> Videotaped testimony. If a prospective witness who is scheduled to testify before a grand jury or at a preliminary hearing is less than 14 years of age, the court shall, upon the motion of the district attorney, and may, upon its own motion, order the child's testimony to be videotaped at the time it is given.

U.S. 56 (1980); White v. Illinois, ...... U.S. ......, ......, 112 S.Ct. 736, 741 (1992) (unavailability analysis is a necessary part of Confrontation Clause inquiry only if challenged out-of-court statements are made in course of prior judicial proceeding). Accordingly, we conclude that NRS 174.229 may only be utilized to show videotaped testimony at trial if a child witness is unavailable to testify.

Second, NRS 174.229 makes no provision for the defendant's Confrontation Clause guarantee of physical presence in the courtroom, i.e. the right to face-to-face confrontation. Before excluding a defendant from an adversarial proceeding, a court must make case-specific findings of necessity. In Coy v. Iowa, 487 U.S. 1012 (1988), the Supreme Court reversed a CSA conviction because the trial court permitted the prosecution to use screens to block the children's view of the defendants. The Supreme Court held that, without a finding of necessity, such a procedure violated the Confrontation Clause. *Id.* at 1020-21.

In Maryland v. Craig, 497 U.S. 836 (1990), the Court clarified the showing of necessity required to exclude a defendant from the trial. The *Craig* court held that shielding child witnesses from CSA defendants is constitutional, but only if the trial judge makes three case-specific findings. The trial court must: (1) hear evidence and determine whether use of a one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness; (2) find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant; and (3) find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis,* i.e., more than mere nervousness, excitement, or reluctance to testify. *Craig,* 497 U.S. at 855-56. Any shielding of a child witness, whether through screens or closed circuit television, must afford the defendant the opportunity for cross-examination. Also, the judge, jury, and defendant must be able to observe the witness's demeanor. *Id.* at 851, 858.

The Court declined to state exactly what degree of trauma is required before a shielding procedure may be used. However, it found that constitutional standards would be met where serious emotional distress, such that the child could not reasonably communicate, would occur. *Id.* at 856-57. The Court stated that federal constitutional law does not require that the judge personally examine the witness for potential trauma in the presence of the defendant, or consider less restrictive alternatives such as one-way television, but that such proceedings would be helpful. *Id.* at 859-60.

The State contends that the *Craig/Coy* requirements of findings of necessity apply only to the trial phase of the proceedings and that NRS 174.229 is not unconstitutional because it encompasses only pretrial videotaped testimony. The Supreme Court has affirmed the exclusion of a defendant from a CSA competency hearing. Kentucky v. Stincer, 482 U.S. 730 (1987). However, the Court noted that competency hearings are different because they do not concern the issue of the defendant's guilt. Moreover, in *Stincer,* no part of the competency hearing was introduced at trial.

In the instant case, preliminary hearing videotaped testimony of four of the children was admitted into evidence at trial after each child testified at trial. The motion to exclude the appellants from the preliminary hearing was made the day of the hearing, and no evidence showing a need for excluding the appellants was presented. We conclude that the failure to adhere to the *Craig/Coy* requirements at a preliminary hearing should preclude the use of any preliminary hearing testimony at trial. *See* State v. Crandall, 577 A.2d 483 (N.J. 1990) (statutes authorizing exclusion of defendants from the courtroom are constitutional only when the statutes require case-specific findings of necessity); State v. Tafoya, 765 P.2d 1183 (N.M.Ct.App. 1988) (court must make *Coy* findings of necessity before defendants can be excluded from videotaped deposition of child-victim where videotape is used in lieu of child's testimony at trial).

We have previously recognized that a preliminary hearing provides important benefits to the defense of an accused. Sturrock v. State, 95 Nev. 938, 942, 604 P.2d 341, 344 (1979). And, as a general rule, evidence adduced in a preliminary hearing must be evidence which would be admissible at trial. *See* Goldsmith v. Sheriff, 85 Nev. 295, 454 P.2d 86 (1969). Unlike the competency hearing in *Stincer,* preliminary hearing testimony is closely related to the issue of guilt or innocence.

Susan was shielded from Felix and Ontiveros when she testified at the preliminary examination. She again testified at trial in the appellants' presence, and her preliminary examination testimony was subsequently admitted. The exclusion of the appellants, without a determination of necessity, may have made Susan's preliminary examination testimony more credible and her cross-examination less effective. The right to face-to-face confrontation of witnesses testifying at a preliminary hearing and at trial is a basic guarantee to all accused of crime, and it should not be modified unless compelled by true necessity. The failure of the justice court to find any necessity in precluding Felix and Ontiveros from the preliminary hearing deprived them of their constitutional right of confrontation, and the videotapes of the

preliminary hearing should not have been received into evidence at trial. Susan testified at the competency hearing and at trial in the appellants' presence without any shielding, and this leads to the reasonable assumption that shielding was not necessary at the preliminary hearing.

### III. *Legality of Convictions Involving Patricia.*

Felix was convicted of inserting her finger or an unknown object into Patricia's anus and her vagina. In addition to the improper determination that Patricia was competent to testify, we find other infirmities with the convictions based on her hearsay statements. Patricia never testified at any legal proceeding. Her hearsay accusations were elicited at trial from psychologist Bay and again presented on a videotaped interview with Bay. As we have previously discussed, before a court may admit hearsay statements of a child who does not testify, the State must show that each of the child's statements, or series of statements involving one event, are reliable (NRS 51.385 and the federal constitutional Confrontation Clause), and that the child is unavailable or unable to testify (NRS 51.385). We conclude that neither of these showings were made in this case with respect to Patricia.

### A. *Reliability of Hearsay Statements With Regard to Patricia.*

During the pretrial competency hearings, the district court determined that Patricia's hearsay statements were admissible under NRS 51.385, but not under any established hearsay exception. The district court held that the interviewing methodology was not so suggestive as to make Patricia's statements inherently unreliable. The court did not make any findings as to the reliability of each hearsay statement, or series of hearsay statements concerning one event, to be admitted.

The district court's determination that Patricia's hearsay statements were not admissible under any firmly rooted exception to the hearsay rule is supported by substantial evidence. Patricia's accusatory statements were made more than a year after the alleged incidents and only after substantial prodding and suggestive questioning. Patricia denied the truth of her allegations both before and after they were made. These statements were not excited utterances, because they were not made spontaneously or while under excitement of the event. *See* Dearing v. State, 100 Nev. 590, 592, 691 P.2d 419, 420-21 (1984) (victim's statements were excited utterances when made shortly after assault and when victim nervous and upset). Nor do we believe the statements to psychologist Bay were statements made to a health care profes-

sional for the purpose of treatment, and therefore admissible pursuant to NRS 51.115 as statements made in the course of securing medical diagnosis or treatment.[6] The incriminating statements Patricia allegedly made to Bay were made during an interview especially requested by the prosecuting attorney, and Bay took careful notes to report back to him. Bay indicated that she did not take notes when conducting treatment sessions. Patricia's initial interviews with Bay were more in the nature of investigatory sessions with the purpose of confirming that CSA had occurred. There is ample evidence to support the district court's determination that these sessions were not for the medical diagnosis or treatment of Patricia. Therefore, we must determine whether Patricia's hearsay statements were admissible under NRS 51.385 and recent United States Supreme Court cases.

In Idaho v. Wright, 497 U.S. 805 (1990), the defendant was convicted of CSA against two children who were five and one-half and two and one-half years old. Very soon after the alleged CSA, the younger child was taken to the hospital and medically examined for CSA. The doctor found indications that sexual abuse had occurred two to three days before. *Id.* at 808-09. At trial, the child did not testify, but the doctor recounted the statements the child made during the examination. He asked, "Does daddy touch you with his pee-pee?" The child said yes. The child also said, "[D]addy does do this with me, but he does it a lot more with my sister." *Id.* at 810-11. The Court found that the admission of the hearsay statements was not pursuant to any firmly rooted exception to the hearsay rule. This being the case, the Court determined that it must be shown that the statements bore a high indicia of reliability and that cross-examination of the declarant would add little to the quest for truth. The Court held that: (1) the child's first statement was not sufficiently reliable because it was given in response to suggestive questioning, and (2) the second statement was not reliable, even though it was volunteered. When there is evidence of *prior* interrogation, prompting, or manipulation by adults, spontaneity may be an inaccurate indicator of trustworthiness. *Id.* at 826-27. Also, the child's statement showed no additional guarantees of trustworthiness arising from the circumstances surrounding the statement itself.

To find a hearsay statement reliable, a court must examine the totality of the circumstances surrounding the statement, and find that: (1) the declarant was particularly likely to be telling the

---

[6]Patricia Bay was a licensed psychologist. Later in this opinion we analyze NRS 51.115 in greater detail and conclude that statements made to a licensed psychologist may fall within the ambit of this exception.

truth when the statement was made; (2) the statement is at least as reliable as evidence admitted under any of the accepted hearsay exceptions; and (3) the statement is so trustworthy that adversarial questioning would add little to its reliability. *Id.* at 820-23. The Court in *Wright* concluded that corroborating evidence such as medical findings may not be used to demonstrate the reliability of a hearsay statement. Instead, reliability must come from the statement itself and the circumstances surrounding it and not by bootstrapping the statement to other evidence. *Id.* at 823.

We have ruled that the district court must hold a hearing and determine the trustworthiness of a child's hearsay statement before that statement can be received into evidence pursuant to NRS 51.385. Lytle v. State, 107 Nev. 589, 816 P.2d 1082 (1991). In the case at bar, the court ruled that all of Patricia's hearsay statements were "not unreliable." We conclude that the clear import of both *Wright* and NRS 51.385 is that the court must affirmatively determine the reliability of each hearsay statement, or series of statements regarding one transaction or event, prior to its admission. Therefore, the lower court's blanket ruling on the reliability of any and all of Patricia's statements did not satisfy either Nevada law or federal constitutional requirements. If a trial court determines that a child's statements are reliable, it should then make specific findings of fact embracing the reliability determination, considering the factors set forth in *Wright,* and explaining why it concluded that cross-examination would add little to the determination of reliability.

The district court placed the burden of challenging the reliability of Patricia's hearsay statements on the defense, and it did not make an affirmative determination that Patricia's statements contained the requisite indicia of reliability. *Wright* held that the State, as the proponent of the hearsay evidence, bears the burden of affirmatively rebutting the presumptive unreliability of a child's hearsay statements. *Wright,* 497 U.S. at 821.

Courts have considerable discretion in considering factors relevant to reliability. However, the totality of the evidence must indicate that the incriminating hearsay statements are particularly trustworthy. *Wright* sets forth a non-exclusive list of pertinent factors in determining trustworthiness, which include: (1) whether the statements were spontaneous; (2) whether the child was subjected to repetitive questioning; (3) whether the child had a motive to fabricate; (4) whether the child used terminology unexpected of a child of similar age; and (5) whether the child was in a stable mental state. *Id.* at 821-26. Although the *Wright* Court viewed the doctor's leading questions as an important factor, it specifically refused to hold that all interviews of chil-

dren must be recorded, or that leading questions in interviews are a per se bar to reliability. *Id.* at 815-19.

In assessing reliability, courts should examine the earliest statements made by a child-declarant and look for continuity in subsequent statements. *See* Gail S. Goodman and Vicki S. Helgeson Goodman, *Child Sexual Assault: Children's Memory and the Law,* 40 U. Miami L. Rev. 181, 195 (1985) (because research indicates that children's memories are better in interviews conducted soon after the incident, the first interview is critical and should be conducted by specialists, not by police officers or therapists untrained in CSA investigations). Patricia made her first incriminating statement more than a year after the charged offense and then only after much suggestive questioning. The L. children's first interview showed that they did not remember incidents of CSA, and Aaron's trial testimony showed that his memory was unreliable. If Patricia had testified and had been cross-examined, her testimony may have been equally inconclusive.

In State v. Babayan, 106 Nev. 155, 787 P.2d 805 (1990), this court listed several types of "contamination errors" which occur in children's interviews and diminish the reliability of the children's statements. These errors include: systems contamination (outside information gained from police or other sources); cross-contamination (using information gained from other children during therapy with another child); concertizing (repetitive, leading discussions creating false memories in the child); assuming incidents occurred and following a preconceived agenda; coercive questioning; and ignoring or discounting a child's denials. Almost all of the above-mentioned interviewing errors repeatedly occurred in the case at bar.

The following excerpt shows the technique used by Detective Bishop and psychologist Bay at their first interview with Patricia:

> BAY: Did somebody tell you not to tell something?
> PATRICIA: No. I never was (inaudible) but there's one thing I didn't like about Martha.
> BISHOP: What was that?
> PATRICIA: She yelled a lot.
> BISHOP: Did she ever give you a bath?
> PATRICIA: No.
> BAY: Tell us more about what happened at Martha's house.
> PATRICIA: He, she was quite mean.
> BISHOP: What do you mean by mean? . . .
> PATRICIA: Like spanked them sometimes.
> BAY: What else?

PATRICIA: I can't remember. It was such a long time ago. . . .

BISHOP: Whereabouts did she spank you?

PATRICIA: Right here.

BISHOP: Right on the bottom. Okay. Trish, think about this real careful, did anybody touch you when you were at Martha's in a place you didn't like?

PATRICIA: No.

BISHOP: Would you tell me today if somebody did?

PATRICIA: Can't remember, it's too far back.

BISHOP: If someone would have touched you in a place you didn't like you would tell me about it? Would you?

PATRICIA: ˙Yes, but I, but that never happened to me.

BAY: Where would be a place that someone shouldn't touch you? Can you show me on this doll. What do you call that?

PATRICIA: I don't know.

BAY: What do you call this area right here? What do you do with that part of the body?

PATRICIA: Go potty. . . .

BAY: Right. Did anybody ever try and touch you there?

PATRICIA: No.

BAY: Did you ever see anybody get touched there?

PATRICIA: No.

BISHOP: Did anybody ever take any pictures when you were at Martha's?

PATRICIA: No. . . .

BISHOP: Did you ever see anybody get put in closets to get punished?

PATRICIA: No. . . . ◠

BISHOP: Are there some things that you just don't want to talk about?

PATRICIA: That's all I could remember. . . .

BAY: Hey Trish, has anyone ever touched right here on your privates?

PATRICIA: No.

BAY: Do you ever touch yourself there? It's okay, are you embarrassed? . . . That's alright. Who taught you how to do that?

PATRICIA: Nobody.

Bay testified that in the next interview, which was unrecorded, Patricia pointed to her vagina and said, "Martha hurt me." Bay said she could not remember whether this was a spontaneous statement.

In the interview after that, Patricia allegedly made the two

statements that support Felix's convictions. Bay said that Patricia made the first statement in response to a prompt that Aaron said he saw Felix "do things to her," but that the second statement was spontaneous. The method used to obtain the first statement is referred to as coercive questioning or assuming facts. In *Babayan,* we found this method was condemned by the experts, and the defense experts in this case challenged it as prejudicial and likely to elicit unreliable answers. Even if the second statement was spontaneous, there is no way to determine the extent to which the prior coercive questioning actually affected the statement. Under these circumstances, Patricia's second statement is less reliable than the spontaneous statement elicited in Idaho v. Wright, 497 U.S. 805 (1990), and therefore it should not have been admitted.

There are many other indications that the statements by which appellants were convicted of assaulting Patricia were not reliable. One prominent factor making the statements at issue here unreliable is something the expert in *Babayan* called "systems contamination." Detective Coffey's police report before the first interview states that she asked Ms. L. to discuss the allegations with her children. In a subsequent interview, Aaron said that his mother had told him Ontiveros "probably" had touched Noray Ann's vagina. In the initial interviews, Patricia made no mention of animals being killed at the day care center as had Susan, but subsequently Patricia was making similar allegations. Bay clearly received some information on the children's stories from both Detective Coffey and Patricia's mother that was transmitted to the L. children.

Other suggestions of prejudicial interviewing techniques include the fact that the children learned terminology from the psychologists, and that the critical second and third interviews were not recorded. Although *Wright* does not require that psychologists record interviews, the lack of recordation renders the interviews somewhat suspect, especially in light of the improper techniques used in later interviews in this case. Bay quoted Patricia as saying "vagina," when, soon before, in the first interview, Patricia had not known how to refer to genitalia except by saying that they were used to "go potty."

In all, the interviewing techniques used on Patricia undermine the reliability of Patricia's statements, and it cannot be said that adversarial testing would add little to her statements' reliability.

We have held that when a district court fails to make the determination that a child's hearsay statements are reliable, as

required by NRS 51.385, the conviction must be reversed. *Lytle v. State*, 107 Nev. 589, 591, 816 P.2d 1082, 1083 (1991). Where, as here, the burden of proof was shifted to the defense and the wrong standard applied by the district court in making the reliability determination, we will also reverse the conviction unless the record clearly demonstrates that the hearsay statement or statements admitted were reliable to such a degree that cross-examination would have added little to the inquiry. We do not believe that we, as an appellate court, should be making the reliability determination in close cases. Reviewing Patricia's hearsay statements and the interviewing techniques to which she was subjected, her statements appear more unreliable than reliable. Perhaps that is the reason the district court failed to make an affirmative determination of reliability and only determined that the statements were not unreliable.

Many courts have recognized, as we do here, that children's accusatory statements present special problems in assessing reliability. In *State v. Matsamas*, 808 P.2d 1048 (Utah 1991), Justice Stewart, in a concurring opinion, echoed the concerns of defense expert Dr. Lee Coleman:

> Children's declarations concerning abuse may raise special problems of reliability. That is especially true when the adults concerned are involved in a custody dispute or for other reasons are antagonistic to each other. Accusations made by children may have such a reverberating clang as to all but drown out exculpatory evidence in the minds of jurors. For the most part, children, especially young children, do not lie, at least in the sense that gives rise to a judgment of moral culpability. However, they can misstate reality and even confuse imagination, fantasy, and confabulation with reality, and sometimes not know that they have done so. Children may also perceive in a reasonably accurate way, but describe the perception in an unintentionally misleading manner. A child's inaccurate declaration may also result from psychological processes that have the appearance of accurate recall, but in reality are not. Discrimination between factually accurate and inaccurate statements can be difficult, and sometimes impossible. One important cause of unreliability may be a child's desire to please adults or avoid blame or guilt feelings. The willingness to give suggested answers to leading questions and thereby construct "facts" in response to a suggested scenario is not uncommon. Children—and sometimes adults—who accept such suggestions and transmute them to "facts" can "construct" a "memory" of those "facts" that becomes indistinguishable from reality in their minds.

*Id.* at 1055 (Stewart, J., concurring).

And, in Maryland v. Craig, 497 U.S. 836 (1990), Justice Scalia, in his dissent, cautioned that a parent could be convicted of CSA without giving the parent so much as the opportunity to sit in the presence of the child and ask the child whether the charges are false.

> Perhaps that is a procedure today's society desires; perhaps (though I doubt it) it is even a fair procedure; but it is assuredly not a procedure permitted by the Constitution.

*Id.* at 861 (Scalia, J., dissenting). Later in the dissent, Justice Scalia recognized that children's testimony often may be unreliable and he cited an injustice that occurred in Jordan, Minnesota, when false accusations by children affected many innocent people:

> Some studies show that children are substantially more vulnerable to suggestion than adults, and often unable to separate recollected fantasy (or suggestion) from reality. See Lindsay & Johnson, Reality Monitoring and Suggestibility: Children's Ability to Discriminate Among Memories From Different Sources, in Children's Eyewitness Memory 92 (S. Ceci, M. Toglia, & D. Ross eds. 1987); Feher, The Alleged Molestation Victim, The Rules of Evidence, and the Constitution: Should Children Really Be Seen and Not Heard?, 14 Am.J.Crim.L. 227, 230-233 (1987); Christiansen, The Testimony of Child Witnesses: Fact, Fantasy, and the Influence of Pretrial Interviews, 62 Wash.L.Rev. 705, 708-711 (1987). The injustice their erroneous testimony can produce is evidence by the tragic Scott County investigations of 1983-1984, which disrupted the lives of many (as far as we know) innocent people in the small town of Jordan, Minnesota. At one stage those investigations were pursuing allegations by at least eight children of multiple murders, but the prosecutions actually initiated charged only sexual abuse. Specifically, 24 adults were charged with molesting 37 children. In the course of the investigations, 25 children were placed in foster homes. Of the 24 indicted defendants, one pleaded guilty, two were acquitted at trial, and the charges against the remaining 21 were voluntarily dismissed.

*Id.* at 868 (Scalia, J., dissenting).

The concerns expressed by Justice Scalia seem especially appropriate when applied to the instant case. Patricia's baby sitters were convicted of assaulting her without ever being in the same room with her once their baby sitting services ended, or were they afforded the opportunity to cross-examine her at trial.

We conclude that the district court erred by making a blanket reliability ruling concerning Patricia's hearsay statements. First, the ruling did not consider the reliability of each statement or series of statements individually. Second, the burden of proof was placed on the defense, which was required to show that the statements were unreliable, rather than on the State, which should have been required to establish that the statements were affirmatively reliable. Third, the district court applied the wrong standard when determining reliability; to wit, failing to affirmatively determine that Patricia's hearsay statements were reliable. In reviewing the record, we cannot affirmatively say that Patricia's hearsay statements are reliable. Therefore, these hearsay statements should not have been received into evidence, and without them, the convictions based on such evidence cannot stand.

### B. *Patricia L.'s Unavailability as a Witness.*

NRS 51.385 requires that a child be "unavailable or unable" to testify before that child's statement may be admitted if the child does not testify. We realize that testifying in court can be a very traumatic experience for a child and that some children need to be shielded from the defendant or permitted not to testify. Nevertheless, we conclude that the district court was too hasty in its determination that Patricia was unavailable as a witness due to the trauma she might suffer from testifying.

The traditional grounds of unavailability set forth in NRS 51.055[7] were not present in this case. The lower court found that Patricia was not suffering from then-existing trauma. However, in Idaho v. Wright, 497 U.S. 805 (1990), the Court assumed the child witness was unavailable, suggesting that a child's prospective psychological inability to testify is a ground for unavailabil-

---

[7]NRS 51.055 states:

"Unavailable as a witness" defined.

1. A declarant is "unavailable as a witness" if he is:

(a) Exempted by ruling of the judge on the ground of privilege from testifying concerning the subject matter of his statement;

(b) Persistent in refusing to testify despite an order of the judge to do so;

(c) Unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(d) Absent from the hearing and beyond the jurisdiction of the court to compel appearance and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance or to take his deposition.

2. A declarant is not "unavailable as a witness" if his exemption, refusal, inability or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testify.

ity. *Id.* at 816. Proof of this type of unavailability is usually a medical question that requires expert testimony.

The constitutional question at issue is whether a court can determine if a child is unavailable because he or she may suffer severe trauma without placing the child on the stand. In *Wright,* the Supreme Court left this question open. State statutes vary in the degree of resulting trauma required for a finding of unavailability, and state courts have not reached a consensus on a standard. However, as we discussed earlier, the standard for finding the trauma required to exclude a defendant from the courtroom is high, requiring a showing of necessity. *Craig,* 497 U.S. at 857-58. The standard used to excuse a child from testifying altogether, and thereby eliminating the right to confrontation, should be equally strict. Serious psychological trauma, as opposed to merely unnecessary trauma, should be required. *See* Michael H. Graham, *Indicia of Reliability and Face to Face Confrontation: Emerging Issues in Child Sexual Abuse Prosecutions,* 40 U. Miami L. Rev. 19, 83 (1985) (advocating a standard of extreme trauma and noting that attorneys and psychologists at a recent conference on CSA reported that a great majority of children are capable of testifying at trial without much difficulty).

The California Supreme Court has addressed the problem of determining prospective psychological unavailability in a CSA case. People v. Stritzinger, 668 P.2d 738 (Cal. 1983) (mother's testimony was insufficient; medical testimony was required to prove psychological unavailability in a CSA case). In *Stritzinger,* the court held the State should use expert testimony to show that testifying would be "relatively impossible," not merely difficult. *See also* Warren v. United States, 436 A.2d 821 (D.C.App. 1981) (a factor to consider in finding unavailability is whether the trauma is greater than that normally expected of a CSA victim).

To establish an acceptable basis for permitting a child not to testify, we conclude that the State must demonstrate by a preponderance of the evidence that it is reasonably probable that testifying will cause the child witness serious, non-transitory psychological injury beyond the discomfort normally expected in these circumstances. The court generally must examine the child in person. If the court determines that face-to-face confrontation will probably cause the child serious psychological trauma, it may inquire into less restrictive alternatives, such as excluding the defendant or the child from the courtroom during the testimony. In accord with *Stritzinger,* some expert testimony beyond that of the child's parent is usually required, but a parent's testimony is certainly relevant and should be considered. Except

in cases that would most probably result in extreme trauma, the district court should carefully consider and ordinarily grant defense requests for an independent expert on this issue. *See* State v. Babayan, 106 Nev. 155, 787 P.2d 805 (1990) (district court granted defense motion for independent expert evaluations on interviewing techniques based partly on children's incredible stories).

The district court heard testimony from both Patricia's mother and Patricia's psychologist, Ms. Bay. They both asserted that testifying would unduly traumatize Patricia. Ms. Bay stated her opinion that testifying could cause Patricia long-term psychological problems, resulting in a complete deterioration of her mental health. In explaining to Patricia what would happen when she testified, Bay used a doll house courtroom and told her that Felix would be present. This resulted in Patricia's decision not to testify because to do so in the presence of Felix was her greatest fear. Bay never explained that the elimination of Felix from the courtroom was possible.

Based on Bay's opinion, the court found, by a preponderance of the evidence, that the possibility of resulting trauma was great enough that Patricia need not testify at trial. However, the court never interviewed Patricia directly, either in court or in camera. As previously stated, the court, and not only a psychologist, should explain to the child what testifying will entail and that the defendant may be shielded or removed from the courtroom when the child testifies. Nowhere does the record indicate that Patricia would have been unable to appear before the district judge. The opportunity for the district judge to hear and observe the child is no less important in making the "unavailable" determination than it is in determining competence. In fact, declaring a child unavailable to testify in most cases will prevent a defendant from any effective cross-examination. Such a finding should be made carefully and based on substantial evidence, with consideration given to alternatives less severe than the child's not testifying at all.

Basing a finding of unavailability due to prospective trauma on Bay's testimony is also problematic. Bay played a key role in eliciting the critical statements from Patricia and clearly assumed that the suspected CSA had been perpetrated on the L. children. She conducted ninety-eight interviews with the children and was compensated by Nevada Victims of Crime Fund, with her payment contingent on a determination that Patricia was the victim of a crime, and Bay's report was a critical part of that determination. Her testimony resulted in two of the four convictions rendered by the jury, and throughout the investigation and trial, she

seemed to be more of an advocate than an impartial health care professional. We also question whether a psychologist with a M.A. degree in educational psychology has sufficient training to make a medical prediction concerning long-term trauma. Although no particular academic degree is required, a Ph.D. in clinical psychology or an M.D. in psychiatry would serve to strengthen the conclusion of unavailability. The district court would have been well advised to have had an independent child psychiatrist assist the court in making this critical determination.

The significance of the court's unavailability determination concerning Patricia can be seen in examining the testimony of her brother, Aaron. Aaron had made the same types of accusatory statements to Bay as Patricia made, and Bay concluded that he was also the victim of sexual assault. But Aaron testified, and the defense was permitted to examine him. His testimony was vague and he recanted the allegations he had made earlier. The appellants were acquitted of the charges involving Aaron, and it is at least problematical whether the same result would have been reached as to the charges involving Patricia if she had testified.

We conclude that, in addition to there being an insufficient showing of Patricia's competence to testify and of the reliability of her statements, the determination that Patricia was unavailable is not supported by sufficient credible evidence. Therefore, without more, the admission of Patricia's hearsay statements was erroneous.

### IV. *The Legality of the Convictions Involving Susan Y.*

In addition to our determination that Susan was not competent to testify about events that occurred at the day care center, there are four more errors that require the reversal of the convictions concerning Susan. First, the videotape of Susan's testimony at the preliminary hearing was introduced after Susan testified, and an additional allegation was stated on the tape to which Susan had not previously testified. Second, the district court erred in making the determination that Susan's hearsay statements were reliable pursuant to NRS 51.385 and there is insufficient evidence in the record to affirmatively establish that such statements are reliable. Third, the receipt into evidence of so many accusatory hearsay statements made by Susan without a proper determination of their reliability and necessity cumulatively prejudiced the appellants. Fourth, psychologist Fisher testified that Susan was a forthright person, thereby impermissibly commenting directly on her veracity.

### A. *Inability to Conduct Effective Cross-Examination of Susan Y.*

If a child testifies and is subject to cross-examination, the State

may introduce the child's hearsay statements pursuant to NRS 51.385, without violating the Confrontation Clause of the United States Constitution. However, in this case, the State continued to introduce statements recounting Susan's accusatory hearsay statements after Susan had been excused as a witness. These statements were presented through the testimony of Susan's mother and psychologist Payne, and by Susan in her videotaped preliminary hearing testimony. The videotape of Susan's preliminary hearing testimony contained her allegation that Ontiveros stuck a knitting needle up her crotch, which may have supported the one count involving Susan for which Ontiveros was convicted. The defense was unable to cross-examine Susan on several statements that others claimed she had made. California v. Green, 399 U.S. 149 (1970), requires that cross-examination be "full and effective." *Id.* at 158. As a practical matter, if a child is excused before her hearsay statements are proffered, the defense has no opportunity to cross-examine the child on those statements. On remand in *Green,* the California Supreme Court held that admission of an unsworn hearsay statement did not violate the Confrontation Clause because the declarant was recalled to the stand after the police officer recounted the declarant's prior statement. People v. Green, 479 P.2d 998 (Cal. 1971) (en banc). This procedure gave the defense an opportunity to cross-examine the declarant about the hearsay statement. The same opportunity should have been afforded the defense in this case.

We adopted a similar procedure in Jacobs v. State, 101 Nev. 356, 705 P.2d 130 (1985), for allowing the admission of prior consistent statements to rebut claims of undue influence of a witness pursuant to NRS 51.035(2)(b). In *Jacobs,* the defendant was charged with murdering his ex-wife. His five-year-old son testified against him and left for Arkansas before the trial was over. Defendant's counsel then attempted to impeach the boy's testimony by suggesting that his grandmother improperly influenced him. With the boy out of the jurisdiction, the trial court admitted prior consistent statements the boy had made to police. We decided that admitting this evidence was reversible error because the boy could not be cross-examined on these statements. *Id.* at 358, 705 P.2d at 131-32. Admittedly, NRS 51.035(2)(b) specifically requires that the defendant have the right to cross-examine the declarant and NRS 51.385 does not. However, the requirement that a defendant be permitted to examine the declarant about an earlier hearsay statement received into evidence after declarant's trial testimony is desirable and would protect the integrity of the court's truth-finding mission.

Arguably, the defense could have recalled Susan and other children for cross-examination. However, we conclude that plac-

ing that burden on the defense is unfair. In *Long v. State*, 742 S.W.2d 302, 319 (Tex.Ct.App. 1987), the court considered a statute which admitted child testimony, so long as the child was "available to testify." The court held that requiring the defense to call a child to the stand for cross-examination regarding the videotape would violate due process. *Long* notes that such a requirement would put the defense in a "Catch-22" position. If the State does not call the child to testify, the defense must either forego the right of cross-examination or call the child to the stand with the very real risk of incurring the wrath of the jury, which would blame the defense for forcing the child to testify. *Id.* at 320. The Catch-22 posed to the defense in this case was as serious as that in *Long*. In this case, the defense had to either forego its right to cross-examination, or prejudice itself by calling children like Susan to the stand to be examined a second time.

Our conclusion is supported by other authorities. Sosebee v. State, 357 S.E.2d 562 (Ga. 1987) (interpreting a statute similar to NRS 51.385, court concluded that prosecution or court must make declarant available to defense for further cross-examination if hearsay statements of declarant alleging additional crimes are received into evidence after declarant testified); *see also* Michael H. Graham, *The Confrontation Clause, the Hearsay Rule, and Child Sexual Abuse Prosecutions: The State of the Relationship*, 72 Minn. L. Rev. 523, 580-86 (1988) (supporting this view, and stating other reasons why the burden to call the child rests with the proponent of the hearsay statements).

Some courts have suggested that requiring defense counsel to recall a witness whose hearsay statements have been introduced subsequent to his or her testimony in CSA cases is not unconstitutional. One court even placed this burden on the defense when the child's hearsay statement was admitted under an exception which is not firmly rooted, the residual reliability exception. U.S. v. Cree, 778 F.2d 474 (8th Cir. 1985). We find this view unsound because it leaves the defense in the Catch-22 heretofore described. *See Long,* 742 S.W.2d at 320.

In order to avoid placing the defense in such an unfair dilemma, the *Sosebee* court concluded that Georgia's child hearsay statute (a statute quite similar to NRS 51.385) requires that at the close of the State's case-in-chief, either the defense or the State may request that a child witness or hearsay declarant be called or recalled for cross-examination regarding hearsay statements already admitted. *Sosebee,* 357 S.E.2d at 563. The court also must inform the jury that the court, not the State or defense, is calling the witness. In order to avoid interfering with the defense's opportunity to cross-examine effectively, we construe NRS 51.385 to require that either the State or the court recall a

child witness upon the request of the defense, if hearsay statements not firmly rooted in a hearsay exception are introduced subsequent to the child's testimony, and the child-victim did not cover the statements in his or her testimony.

### B. *Failure to Rule Properly on the Reliability of Susan Y.'s Hearsay Statements.*

Many of Susan's accusatory hearsay statements were received at trial through the testimony of a number of witnesses. But, since Susan testified at both the preliminary hearing and at trial, no Confrontation Clause issue is presented other than that addressed in the previous section. However, NRS 51.385 requires that an affirmative showing of trustworthiness be made before hearsay statements are received. We must consider whether the district court made such a determination as contemplated by this statute.

The district court found that none of Susan's statements fell within a firmly rooted exception to the hearsay rule. Susan's accusatory hearsay statements were testified to by her mother, Detective Coffey, psychologists Fisher and Payne, and Dr. Scully. These hearsay statements were not spontaneous and were not made under excitement of the event and therefore were not excited utterances admissible pursuant to NRS 51.095. *See also* Dearing v. State, 100 Nev. 590, 691 P.2d 419 (1984); Hogan v. State, 103 Nev. 21, 23, 732 P.2d 422, 423 (1987) (victim's hearsay statement was excited utterance because made shortly after defendant threatened to kill her and while she was still frightened by it). Whether Susan's hearsay statements made to Dr. Scully and the psychologists should have been admitted as statements made for the purpose of medical diagnosis or treatment pursuant to NRS 51.115[8] requires further analysis.

The rationale behind admitting hearsay statements made to a health care provider is that these statements are very reliable because a patient would not lie or deceive his or her physician when describing his or her condition or discomfort for the purpose of diagnosis or treatment. *See* 2 John William Strong, McCormick on Evidence § 277, at 246-47 (4th ed. 1992); White

---

[8]NRS 51.115 states:

> Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof are not inadmissible under the hearsay rule insofar as they were reasonably pertinent to diagnosis or treatment.

v. Illinois, ...... U.S. ......, ......, 112 S.Ct. 736, 742-43 (1992); *see generally* 6 John H. Wigmore, Evidence in Trials at Common Law §§ 1719-22 (Chadbourn rev. 1976). Reliability therefore only exists where the patient understands the need to tell the truth and the health information given by the patient is necessary for assisting or treating the patient. When a patient is giving information to a psychiatrist, a psychologist, or a family therapist or counselor for diagnosis or treatment of a psychological or mental problem, the rationale behind reliability of these statements becomes less convincing because the declarant is not requesting immediate relief for a physical ailment. This belief was well stated in People v. LaLone, 437 N.W.2d 611 (Mich. 1989):

> It is therefore fair to say that, while medical patients may fabricate descriptions of their complaints and the general character of the causes of these complaints, we would think it less likely that they will do so than psychological patients. In addition, although there are psychological tests, fabrications of physical complaints would seem to be far easier to discover through empirical tests than are fabrications which might be heard by an examining psychologist. . . . Thus, statements made in the course of the treatment of psychological disorders may not always be as reliable as those made in the course of the treatment of physical disorders.

*Id.* at 613.

Not surprisingly, courts have split on whether to admit hearsay statements made to mental health care providers for the purpose of medical treatment. Some courts have determined that the rationale for the reliability of statements made for medical purposes is so undermined when made to psychologists or psychiatrists that statements made to these health care providers are outside the exception and should not be admitted into evidence. *See* State v. Zimmerman, 829 P.2d 861 (Idaho 1992); State v. Harris, 808 P.2d 453 (Mont. 1991). Other courts have held that such statements are within the medical treatment exception if made to psychiatrists or psychologists for the purpose of diagnosis or treatment. *See* State v. Robinson, 735 P.2d 801 (Ariz. 1987); State v. Altgilbers, 786 P.2d 680 (N.M. 1990). Still other courts have held that such statements are within the medical treatment exception if made about the patient's mental or physical condition or the facts of an event related to the condition, but are not within the exception if made about the identity of the perpetrator unless it is clearly shown that such information was necessary for diagnosis or treatment. *See* King v. People, 785 P.2d 596 (Colo. 1990); Sluka v. State, 717 P.2d 394 (Alaska Ct.App. 1986); State v. Fitzgerald, 694 P.2d 1117 (Wash.Ct.App. 1985).

We believe that statements made to a psychiatrist or psychologist can be made for the purpose of medical treatment or diagnosis, albeit for a psychological problem, and these statements may be sufficiently reliable to be included within the ambit of NRS 51.115. We do not feel that the exception should ordinarily be extended to statements made to therapists or family counselors who are not licensed psychologists or psychiatrists. In proffering statements made to psychiatrists or psychologists for the purpose of medical treatment or diagnosis, the proponent of the evidence must show, directly or indirectly, and the trial court must satisfy itself, that the patient understood the need to speak truthfully and that the statements were reasonably necessary for the treatment or diagnosis of the patient. Further, we restate the admonition of the Utah Supreme Court that the exception permitting psychologists or psychiatrists to testify to hearsay statements made by patients for medical treatment should not be an open-ended invitation to admit all evidence of any statements made to these health care providers.

> A psychiatrist or a psychologist of course cannot be made a conduit for testifying in court as to any and all out-of-court statements made. As with admission of evidence of any kind, great discretion is accorded the trial judge in the determination of admissibility. The trial court must, as with any evidence, assess the inherent reliability of the testimony, the relevance of the testimony, and undertake a balancing test, particularly of prejudice versus probativeness . . . .

State v. Schreuder, 726 P.2d 1215, 1225 (Utah 1986).

With this in mind, we review the hearsay statements made by Susan and testified to by Dr. Scully and psychologists Payne and Fisher. Dr. Scully is a pediatrician and examined Susan at the request of her parents and law enforcement officers to confirm that she had been the victim of CSA. There is ample evidence to sustain the district court's determination that Dr. Scully did not examine Susan for treatment or diagnosis, but rather conducted an examination in the nature of an investigative consultation. Although inquiry into the identity of the perpetrator of CSA may be necessary for treatment or diagnosis by a psychologist or psychiatrist, it is usually not necessary information for a pediatrician; and, we do not believe the reference to statements concerning the "general character of the cause or external source thereof," as used in NRS 51.115, was meant to include the specific identity of the perpetrator of a criminal act. We conclude that the district court did not err in determining that Dr. Scully's

statements were not admissible pursuant to NRS 51.115 because his examination was investigatory and the information he solicited from Susan was not shown to be necessary for treatment or diagnosis.

Susan met with psychologist Payne at the instigation of law enforcement personnel. The sheriff's office wanted a better credentialed expert and one who might be able to secure better responses from the children. Payne assumed that Susan had experienced CSA and questioned her extensively about what happened and the identity of the perpetrators. We do not doubt that Payne provided therapy and treatment to Susan in the twenty-nine sessions she conducted, but there is sufficient evidence to conclude that in the early sessions, when Susan made most of her accusatory statements, Payne was acting more as an investigator and less as a treating psychologist. In the early stages of her consultation with Susan, Payne worked closely with Detective Coffey, providing her information concerning Payne's sessions with Susan. The sheriff's office paid for Susan's first three visits with Payne, and the Nevada Victims of Crime Fund paid for most of the other treatments. Again, no payment was made by the fund without a finding that Susan had been abused. Sufficient evidence supports the district court's conclusion that the statements made by Susan to Payne were not for medical treatment and diagnosis.

[Headnote 34]

Joanne Fisher was a private psychologist practicing with a group of psychologists in Carson City, Nevada. Susan was taken by her mother to Fisher for consultation. It cannot be denied that Susan's consultation was for treatment or diagnosis of the problems Susan was then experiencing. Neither Susan's nor Fisher's testimony focused on whether Susan understood the importance of telling the truth to Fisher, a health care professional, and Fisher was not asked at trial to explain her need for the information she elicited from Susan about the assaults and molestations Susan had allegedly suffered and about the perpetrator's identity. However, all of these facts can be inferred from the record, except for the need to know the identity of the perpetrator. Therefore, most of the accusatory statements made by Susan to Fisher should have been received into evidence pursuant to NRS 51.115 because they were statements made to a psychologist for the purpose of medical treatment or diagnosis. However, none of Susan's accusatory hearsay statements testified to by Susan's mother, Detective Coffey, psychologist Payne, or Dr. Scully fell within a firmly rooted exception to the hearsay rule. Therefore, the reliability of these hearsay statements must be examined.

The district court found that Susan's hearsay statements were admissible because the defense had not clearly established that the interviewers' questioning techniques were so suggestive and improper as to render Susan's answers unreliable. Again, this was a blanket ruling on all of Susan's hearsay statements. The court started from the premise that Susan's statements were reliable and required the defense to show them to be otherwise before they would be excluded at trial. Hearsay is presumed to be unreliable and not admissible at trial. *See* Idaho v. Wright, 497 U.S. 805, 818 (1990). To show that hearsay is trustworthy under NRS 51.385, the prosecution has the burden of affirmatively establishing that the hearsay statement is trustworthy and bears particularized indicia of reliability. With the evidence in this case so conflicting, and because substantial questions were raised about the reliability of Susan's testimony, it was critically important for the district court to start with the proper premise, and only then to make specific findings in support of its legal conclusions as to reliability.

Notwithstanding the significant shortcomings in the district court's reliability finding pursuant to NRS 51.385, our analysis of the evidence to determine whether the hearsay statements were reliable leads us to the conclusion that the reliability determination of Susan's hearsay statements was a reasonably close one. As we have previously indicated, we will decline to make that determination on appeal unless the factual determination is obvious, one way or the other.

In reviewing Susan's testimony, the determination of the reliability of her hearsay statements is not obvious. Susan was three years and five months old when she left the day care center. Dr. Coleman indicated that children's memories at this age consist of little more than photographic images. Susan's revelations of alleged abuse came several years after the alleged incidents and were developed only after substantial suggestive and leading questioning. However, the interviewing techniques used with Susan were not as flawed as those to which the L. children were subjected.

Susan's initial denial of CSA came in response to a leading question similar to a question discussed in Idaho v. Wright, 497 U.S. 805 (1990). Even though Susan later made additional spontaneous statements, those statements probably do not meet the *Wright* standard for reliability, given the antecedent leading questions, the length of time between the alleged events and disclosure, and the manipulative interviewing techniques that could have caused Susan to confuse truth and falsity.

An example of the coercive technique that a psychologist used with Susan is as follows:

> Q: Let's remember when we were talking about how they put their mouth on you and they kissed you. . . . What term do you want to use for that? Do you want to say sex? Do you want to say they had sex?
>
> A: Yeah. . . .
>
> Q: Did Martha and Paco have sex with your little brother?
>
> A: Yes.

Yet, in another interview four days later, the psychologist asked Susan if she knew what sex was, and she said, "Not really."

Susan's accusations of CSA are very general and were often inconsistent. She testified that Ontiveros stuck his penis, a knife, a knitting needle, and his finger up her vagina, and that Felix stuck her finger in her crotch. As to the frequency, she stated it happened "all the time" or "a lot of times." Susan gave no indication when it happened during her one year attendance at the day care center. While we have granted reasonable latitude to children when describing sexual assault, we do require that some reliable indicia be shown as to the facts of the crimes and their frequency. As this court recently observed in LaPierre v. State, 108 Nev. 528, 836 P.2d 56 (1992):

> We have repeatedly held that the testimony of a sexual assault victim alone is sufficient to uphold a conviction. However, the victim must testify with *some* particularity regarding the incident in order to uphold the charge. . . . We do not require that the victim specify exact numbers of incidents, but there must be some reliable indicia that the number of acts charged actually occurred.

*Id.* at 531, 836 P.2d at 58 (citations omitted). We are not called upon to determine whether Susan's testimony is sufficiently particularized to support the convictions, but the lack of specificity certainly does reflect on the reliability of her accusatory statements.

Although we are analyzing the reliability requirements set forth in NRS 51.385 and are not compelled to follow the federal format established in Idaho v. Wright, 497 U.S. 805 (1990), and White v. Illinois, ...... U.S. ......, 112 S.Ct. 736 (1992), because Susan testified at trial and was subject to cross-examination, we have generally adhered to their analyses. However, unlike the majority in *Wright,* we do believe that corroborating evidence is an important consideration in determining the reliability of an out-of-court statement, and it should not be excluded in making a reliability determination that does not involve federal Confrontation Clause

considerations. *See Wright*, 497 U.S. at 827-34 (Kennedy, J., dissenting); People v. Meeboer, 484 N.W.2d 621, 627 (Mich. 1992). Therefore, while we will generally follow the format set forth in the *Wright* case when determining the reliability of an out-of-court statement pursuant to NRS 51.385, we will look outside the statement itself and to corroborating evidence in making that assessment when federal Confrontation Clause considerations are not implicated.

According to all of the physicians who testified, Susan's accusations that a knife, knitting needle, and long fingernail were inserted in her crotch and that she was subjected to full penile penetration were wholly inconsistent with the physical evidence of her body, and each physician felt these events could not have occurred. Susan's accusations were also entertwined with unbelievable tales of additional events that happened to her and of the killing of animals and humans at the day care center. Excavation of Felix's backyard and of a hillside grave outside of town identified by Susan failed to corroborate her testimony. In fact, excluding the CSA accusations, all of Susan's testimony of the events at Felix's day care center was incredible. We do recognize that Susan appears to be a bright child who has a good memory about other events and who can describe the layout of Felix's house. However, courts have found a child's testimony unreliable when the child's accusatory statements are coupled with additional fantastic observations. *See* State v. Lenaburg, 781 P.2d 432 (Utah 1989) (child's videotaped accusations of sexual assault were held unreliable when coupled with fantastic observations and assertions that assailant had a gun and wore a mask when adult witnesses testified otherwise). We cannot see how the evidence can be viewed in any other light than that a close reliability determination is presented, perhaps leaning more toward unreliability than trustworthiness. This being the case, we decline to make the evidentiary determination that Susan's statements were affirmatively reliable.

## C. *Cumulative Error.*

We have previously concluded that the right of confrontation does not preclude the admission of hearsay statements made by a CSA victim pursuant to NRS 51.385 if the child testifies and is subject to full and effective cross-examination. However, our inquiry does not end there. The admission of hearsay accusations pursuant to NRS 51.385 requires additional consideration of how such hearsay testimony interfaces with our rules generally prohibiting the admission of prior consistent statements, prohibiting

200

the admission of cumulative evidence, prohibiting one witness from vouching for the testimony of another witness, and permitting the district judge to exercise discretion in ruling evidence inadmissible when its probative value is outweighed by its potentially prejudicial effect.

We have long held that prior consistent statements are not admissible unless the credibility of the victim-declarant has been brought into question. Daly v. State, 99 Nev. 564, 568-69, 665 P.2d 798, 802 (1983). And, even when the credibility of the victim is challenged, there is a limit to the prior consistent statements that should be received. The rationale behind this rule is that it would be unfair to permit a victim to tell his or her version of an incident numerous times through the testimony of different witnesses because such testimony would be tantamount to allowing these other witnesses to vouch for the veracity of the victim. Also, prior consistent statement testimony is almost always cumulative and serves no purpose other than to repeat what the victim has or will testify to at trial. *See* 4 John H. Wigmore, Evidence in Trials at Common Law § 1124 (Chadbourn rev. 1972). NRS 51.385, on the other hand, runs counter to the rule because it permits the introduction of prior consistent statements of CSA accusations, whether the declarant-victim testifies or not. NRS 51.385 was enacted to ensure that a CSA victim's accusations are fully and accurately recounted, and we wholeheartedly endorse that purpose. However, the unlimited admission of repetitive hearsay testimony can jeopardize the fundamental fairness of the entire trial proceeding.

To harmonize NRS 51.385 and its laudable purpose with the seemingly conflicting provisions of Nevada law, the receipt of hearsay statements pursuant to this statute should not be completely open-ended. A child's hearsay accusation certainly should be admissible pursuant to NRS 51.385 if the child is unable or unavailable to testify. A parent, police officer, interviewing psychologist, or physician should be able to testify to what a child stated about sexual assault or sexual abuse if this testimony meets the requirements of NRS 51.385 and the United States Constitution. However, once the child's CSA accusations have been fairly presented by one or more witnesses as to the time, the place, and the incident and any challenges to the victim's credibility are fairly met, additional hearsay allegations should be restricted. This limitation is reasonable because: (1) the additional recounting of the alleged crime is usually a prior consistent statement that becomes unnecessary once the victim's allegations have been fully asserted; (2) such testimony is cumulative and usually

amounts to the witness vouching for the victim's testimony; and (3) the continued repetition of CSA accusations would usually render such testimony more prejudicial than probative.

When a CSA victim testifies, the State should be able to elicit additional testimony recounting the child-victim's hearsay accusations of CSA if the child has not fully and accurately described the crime and its surrounding facts and circumstances. There are numerous instances in which a child witness cannot remember the specifics of an incident, such as when an assault took place or the sequence of events, but may have clearly recited them at a prior time. This hearsay should be admissible if it meets the requirements of NRS 51.385. However, once sufficient testimony is received to fully assert the child's allegations, additional hearsay testimony should be judiciously limited for the reasons previously stated.

Other courts have been concerned with the impact that repetition of CSA hearsay allegations may have on the fundamental fairness of a trial. In Traver v. State, 568 N.E.2d 1009 (Ind. 1991), the court reviewed a defendant's convictions for sexually assaulting two children. The evidence against the accused consisted of a videotaped interview with each child and hearsay statements made by the children and recounted by social workers, teachers, physicians, and foster parents. The court first held that the videotapes should not have been received into evidence because a sufficient foundation for reception under Indiana law had not been laid. The court then considered the admission of the adult testimony as to the children's hearsay statements and reached the following conclusion:

> The sum of the adults' hearsay testimony and A.G.'s videotaped *Patterson* statement was much greater than the child's live in-court testimony. The hearsay statements were not merely cumulative, because there is a substantial likelihood that the repetition of the hearsay through adult testimony unfairly and prejudicially created the impression that the adult witnesses were vouching for the credibility of the child. The evidence against Traver was a product of the accusations made by A.G. We must conclude that the admission of hearsay repeating those accusations was prejudicial error.

*Id.* at 1013-14. Similarly, in State v. Thompson, 805 P.2d 1051, 1056 (Ariz.Ct.App. 1990), *on reh'g,* 820 P.2d 335 (1991), in which an eleven-year-old CSA victim testified in court, the court

held that it was reversible error to admit into evidence the cumulative and repetitive hearsay testimony of a school health aide and a friend of the victim. The court determined that it would not disturb the trial court's determination that the child's hearsay statements were reliable and therefore admissible under the residual hearsay exception. However, the court went on to observe that the trial court had not considered whether this cumulative evidence was more prejudicial than probative. The court determined that the cumulative evidence was prejudicial, and it reversed the conviction and remanded the case for a new trial. "Under such circumstances, the continued repetition of the child's statements through the videotape and the testimony of Melanie and Freeman was highly prejudicial." *Id.* at 1056.

The case at bar is a good example of how the repetition of multiple hearsay statements may unfairly magnify the testimony of a victim and call into question the fundamental fairness of the trial. Susan testified to the allegations of CSA and to a variety of unusual and incredible events. Cross-examination seemed very effective in casting doubt on her testimony. But first, Susan's mother, then psychologist Fisher, subsequently repeated Susan's accusatory hearsay statements. Susan's preliminary hearing testimony was then played and the jury heard some of Susan's accusations a third time. Psychologist Payne then testified and also recounted Susan's hearsay allegations of CSA. She was followed by Dr. Scully and Detective Coffey who repeated some of the hearsay allegations made by Susan. Thus, Susan's accusations were recounted a total of six times by other witnesses and by the videotape showing of her preliminary hearing testimony.

Fisher, Payne, Susan's mother, Dr. Scully, and Coffey were all cross-examined by defense counsel, but this cross-examination was limited by the fact that these individuals were not percipient witnesses to the alleged abuse. The defense was wholly unable to cross-examine these witnesses concerning what was taking place at the time the alleged CSA occurred, the sequence of events, and the declarant's ability to have observed that which she reported. Furthermore, adults repeating a child's CSA accusation usually have better verbal communication skills than the child and can often state the allegations in more persuasive terms. What can result is an adult witness who is able to testify more convincingly about the CSA than the child who experienced it, but with the defense less able to conduct an effective cross-examination.

The repetition of multiple child hearsay accusations through several adult witnesses presents the very real possibility of placing the person accused of CSA at an unfair disadvantage. Although some may opine that this is what such an offender

deserves, we must remember that a trial is a procedure to determine whether the accused is the offender and not simply a process to confirm allegations made by the State. No person, neither the alleged victim nor the accused, should be placed at a substantial disadvantage in a criminal trial by the rules of procedure and evidence. We believe that the appellants were disadvantaged in this case by the unbridled introduction into evidence of repetitive hearsay allegations made by Susan when much of this evidence was merely cumulative and unnecessary.

### D. *Psychologist Fisher's Testimony on the Veracity of Susan Y.*

Over defense objections, psychologist Joanne Fisher was permitted to testify as to Susan's veracity. Specifically, Fisher stated that "she is a forthright-type person." This statement by a health care professional is direct testimony on the credibility of the child-victim. We have previously held that such opinions are inadmissible. *See* Lickey v. State, 108 Nev. 191, 827 P.2d 824 (1992); Townsend v. State, 103 Nev. 113, 734 P.2d 708 (1987).

It cannot be said that in this case such a statement was harmless. The jury decisions on the counts involving Susan hinged on whether the jury believed Susan's testimony and her numerous hearsay statements which were related by others. Statements by her psychologist that her accusations were not the product of fantasy and that she was forthright in her answers could well have substantially contributed to the result that the jury reached on these counts. The receipt of this opinion testimony as to the veracity of Susan was reversible error.

### CONCLUSION

Thus, we conclude that NRS 51.385 and the White v. Illinois, ...... U.S. ......, 112 S.Ct. 736 (1992), Maryland v. Craig, 497 U.S. 836, Idaho v. Wright, 497 U.S. 805, and Coy v. Iowa, 487 U.S. 1012 (1988), decisions mandate the reversal of appellants' convictions. While NRS 51.385 and NRS 174.229 are constitutional, NRS 174.229 must be construed to require: (1) the unavailability of the child-victim to testify at trial before the prior testimony may be shown, and (2) the necessity to exclude the defendant from the proceeding to protect the child-victim. The statute with this construction is constitutional and will permit a videotape of the preliminary hearing testimony to be shown at trial. Additionally, an insufficient showing was made for the district court to conclude that Susan and Patricia were competent to testify about events that occurred at the day care center.

We have concentrated on the errors made in admitting evidence concerning the four counts involving Susan and Patricia because convictions resulted from them. However, similar errors occurred in determining the admissibility of evidence relating to the counts involving the other children, and these errors prejudiced the counts concerning Susan and Patricia. Despite a lack of *Craig/Coy* findings of necessity, Felix and Ontiveros were excluded from the preliminary hearings on the counts involving other children, but the videotapes of the preliminary hearing testimony were played at trial after three other children testified. In fact, the videotaped preliminary hearing testimony of Joey C., a female child who testified, was initially ruled inadmissible because it was more prejudicial that probative, but the district court reversed its ruling and ultimately permitted the jury to view this tape after Joey testified.

The reliability findings involving the hearsay statements of other children were blanket findings of reliability and did not include a determination of the affirmative reliability of each hearsay statement made by each child. Some of the hearsay statements of the other children asserted crimes similar to those alleged against the appellants by Susan and Patricia. And, although Noray Ann, Patricia's younger sister, was ruled incompetent to testify, the State introduced into evidence the hearsay statements she allegedly made about abuse. The errors made in the admission of evidence concerning Susan and Patricia were compounded when these same mistakes were repeated in admitting evidence relating to the other counts.

When we view the evidence as a whole, we have serious questions about the fundamental reliability of the verdicts returned against the appellants. There were several persons frequently present at Felix's residence. People other than Felix and Ontiveros were accused of CSA by the children. Even if CSA occurred, we cannot identify the perpetrator without reliable testimony. The hearsay statements of both Patricia and Susan improperly received into evidence at trial were often inconsistent and the medical evidence conclusively showed that most of the claims of sexual assault could not have occurred as described by these girls. Unreliable hearsay statements cannot support a conviction simply because criminal charges have been filed and a prosecution occurs.

The errors committed during these proceedings were so numerous and of such a magnitude that we are unable to consider them to be harmless beyond a reasonable doubt. *See* Coy v. Iowa, 487 U.S. 1012, 1021 (1988) (standard applicable to Confrontation

Clause violations is whether error was harmless beyond a reasonable doubt). Accordingly, we reverse appellants' convictions.[9]

Rose, C. J., Steffen, Young and Springer, JJ., and Zenoff, Sr. J.,[10] concur.

---

[9]The Honorable Miriam Shearing, Justice, did not participate in the decision of this appeal.

[10]The Honorable Charles E. Springer, Justice, appointed The Honorable David Zenoff, Senior Justice, to sit in place of The Honorable John C. Mowbray, Justice.