# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

**February 1, 1999**

**Cecil W. Crowson**
**Appellate Court Clerk**

LOYAL MILLER,                                    )
                                                 )
    Plaintiff/Appellant,                         )    Davidson Chancery
                                                 )    No. 97-4127-I
VS.                                              )
                                                 )    Appeal No.
TENNESSEE BOARD OF PAROLES,                      )    01A01-9806-CH-00293
                                                 )
    Defendant/Appellee.                          )


APPEAL FROM THE CHANCERY COURT
FOR DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR


For the Plaintiff/Appellant:

Kenneth L. Miller
Logan Thompson Miller Bilbo Thompson & Fisher
Cleveland, Tennessee

For the Defendant/Appellee:

John Knox Walkup
Attorney General and Reporter

Michael E. Moore
Solicitor General

Patricia C. Kussmann
Assistant Attorney General


# REVERSED AND REMANDED


WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal involves the fundamental fairness of the procedures used by the Tennessee Board of Paroles to revoke the parole of a person accused of committing child sexual abuse. The Board revoked the parole based solely on hearsay testimony concerning statements made by his alleged victim. The parolee filed a petition for a common-law writ of certiorari in the Chancery Court for Davidson County seeking judicial review of the Board's decision-making process. After the trial court denied the petition, the parolee appealed to this court. We have determined that the Board's hearing officer acted arbitrarily and illegally by applying an incorrect standard to determine whether good cause existed for not allowing the parolee to confront or to cross-examine his only accuser. Accordingly, we reverse the trial court's denial of the parolee's petition for a common-law writ of certiorari and remand the case to the trial court for the entry of an order directing the Board either to conduct a proper parole revocation hearing forthwith or to return the parolee to parole status.

## I.

Loyal Miller stabbed Lynn Howell three times during a knife fight on Spivey Mountain in Unicoi County. After Mr. Howell died of his wounds, Mr. Miller was convicted of second degree murder and was sentenced to thirty years in the Department of Correction.[1] When Mr. Miller was paroled in 1993, he returned to Unicoi County and later moved to Bradley County where he attempted to resume an ordinary life.[2] After settling in Bradley County, Mr. Miller maintained steady employment, reported regularly to his parole officer, paid his parole fees, and remained arrest free.

Some time in 1995, Mr. Miller became acquainted with J.M. who lived next door to him with her four children. J.M. had recently separated from her husband and was in the process of obtaining a divorce. Mr. Miller and J.M. became friends and even dated on

---

[1]The Tennessee Court of Criminal Appeals subsequently affirmed both his conviction and sentence. *See Miller v. State*, No. 36, 1988 WL 33867, at *6 (Tenn. Crim. App. Apr. 12, 1988), perm. app. denied (Tenn. July 25, 1988). Three years later, the Court of Criminal Appeals denied Mr. Miller's petition for post-conviction relief. *See Miller v. State*, No. 51, 1991 WL 180613 (Tenn. Crim. App. Sept. 17, 1991) (No Tenn. R. App. P. 11 application filed).

[2]The record contains sketchy, unreliable hearsay evidence concerning the circumstances surrounding Mr. Miller's decision to move from Unicoi County to Bradley County.

several occasions. He also became friends with J.M.'s children, including D.M.,[3] her eleven-year-old daughter. Mr. Miller was popular with J.M.'s children and the other neighborhood children and, on occasion, took them out for ice cream.

On March 4, 1997, a student at Arnold Elementary School reported to Becky Guthrie, a school counselor, that D.M. was crying in one of the school's bathrooms. Ms. Guthrie found D.M. in a girls' bathroom and escorted the child to her office to talk with her privately. During the interview, D.M. told Ms. Guthrie that Mr. Miller had fondled her between her legs while they had been riding around in his truck during the past weekend. D.M. also recounted other incidents in which she said that Mr. Miller had kissed her on the mouth and had touched her breasts. Ms. Guthrie contacted the local police and the Department of Children's Services, and soon thereafter, representatives of these agencies arrived at the school and took charge of the investigation.

Tom Eady, an employee of the Department of Children's Services, and Detective Sheila Freeman of the Cleveland Police Department interviewed D.M. at the school on March 4, 1997 in Ms. Guthrie's presence. D.M. told them that Mr. Miller had "touched me in places where he shouldn't have." She stated that on February 28, 1997, Mr. Miller had put his hand down the front of her shirt and the front of her pants while they were driving down the road past the library. She also stated that Mr. Miller had put his hand down her pants on two prior occasions and that he put his hands on her breasts while "popping" her back at his house. At the conclusion of the interview, the investigators told D.M. that she had "done the right thing" by talking with them and that "we're going to take care of it."

Detective Freeman interviewed Mr. Miller on April 30, 1997 at the Cleveland Police Department. While Mr. Miller denied ever placing his hands under D.M.'s clothes, he admitted that he had popped her back. He stated that he "would lay her down on the floor on her belly and just take my hands and push up and down on her spine and it will pop her back." When Detective Freeman asked why D.M. had accused him of abusing her, Mr. Miller stated that she had become angry with him several times because he had told her mother that she was getting into cars with boys. He also stated that he thought that D.M. might be trying to "get . . . [him] out of the picture" because she was unhappy about him seeing her mother.

---

[3]The trial court granted the Board permission to submit the record of the parole revocation proceedings under seal because it contains documents disclosing the identity of an alleged victim of child sexual abuse. We question whether Tenn. Code Ann. § 37-1-409(1996) applies to evidence introduced before the Board of Paroles or in common-law certiorari proceedings. However, because of the nature of the alleged offense and the age of the alleged victim, we will refer to the victim and her family members by their initials.

Mr. Miller was arrested on a parole violation warrant but was never criminally charged with sexual battery. On July 16, 1997, he requested a speedy parole revocation hearing. On July 23, 1997, Gale Reed, the supervisor of the Board's office in Bradley County, Linda Brown, Mr. Miller's parole officer, and Diane Hodo, the victim/witness coordinator for the district attorney's office met with J.M. and D.M. to prepare the child for testifying at the parole revocation hearing. They discovered that J.M. did not believe her daughter had been telling the truth and that D.M. would not discuss her accusations about Mr. Miller with anyone other than Kim Brown, a family coordinator with the Governor's Community Prevention Initiative for Children. Kim Brown had apparently been counseling one of D.M.'s siblings concerning matters unrelated to Mr. Miller. They also discovered that D.M. would not permit them to take a videotaped statement.

The Board employees and the victim/witness coordinator decided that D.M. had been "intimidated" and "harassed" because her family did not believe her allegations against Mr. Miller. They decided to ask Kim Brown to have another private discussion with D.M. During a conversation with Kim Brown on August 12, 1997, D.M. recounted two more incidents that she had previously not mentioned to the authorities. One involved an occasion when Mr. Miller had told D.M. that "[y]our pants are big enough for you and I to fit in." The other involved inappropriate touching in Mr. Miller's bedroom, even though D.M. had told the investigators on March 4, 1997, that Mr. Miller had never tried anything in the bedroom.[4] Kim Brown reported back to Ms. Reed on August 13, 1997 that D.M. was "scared and tearful" and that she "appeared to be very confused and scared if she would have to testify . . . [against] Mr. Miller." Based on this information, the Board's employees decided not to call D.M. as a witness at Mr. Miller's parole revocation hearing.

The Board's hearing officer conducted Mr. Miller's parole revocation hearing on August 21, 1997 at the Brushy Mountain Correctional Complex. The parole officer presenting the case against Mr. Miller called only two witnesses – Ms. Guthrie and Mr. Eady. Detective Freeman failed to appear even though she had been subpoenaed, and Kim Brown did not attend because of prior commitments. Over Mr. Miller's strenuous objections, Ms. Guthrie recounted D.M.'s hearsay statements to her on March 4, 1997, and Mr. Eady authenticated the transcript of the interview he and Detective Freeman conducted with D.M. on March 4, 1997. The hearing officer also permitted Mr. Eady and Ms. Guthrie to express their belief that D.M. was telling the truth. Even though Ms. Reed was not called as a

_____

[4]On March 4, 1997, D.M. stated that she had been in Mr. Miller's bedroom looking at a Bible and that Mr. Miller had not done anything in the bedroom. On August 12, 1997, D.M. told Kim Brown that she had gone into Mr. Miller's bedroom looking for "rings for an African American project for school" and that Mr. Miller had followed her into the bedroom and had touched both of her breasts with his hands and had "touched me on my vagina with both hands."

witness, the hearing officer permitted her to recount Ms. Hodo's and Kim Brown's hearsay statements concerning D.M.'s refusal to discuss the incident. The balance of the Board's case consisted of a transcript of the statement Mr. Miller gave to Detective Freeman on April 30, 1997 and a copy of Ms. Kim Brown's report of her conversation with D.M. on August 12, 1997.

Mr. Miller testified on his own behalf. He denied sexually abusing D.M. or touching her in an inappropriate way. He also explained the references to "popping" D.M.'s back by describing how he "popped" D.M.'s older sister's back to help her with headaches caused by her back problems. Apparently the sister's chiropractor also "popped" her back to give her some relief. Mr. Miller stated that he had also "popped" D.M.'s back but denied ever putting his hands on her breasts while doing it. Mr. Miller's attorney also introduced a sworn statement by J.M. In her statement, J.M. confirmed that D.M. had told her that Mr. Miller had put his hands in her pants but added that when she pressed D.M. for details, her daughter told her that "he grabbed a belt loop of her baggy pants, pulled them out and said 'there's enough room in there for both of us.' . . . [D.M.] never told me . . . that . . . [Mr. Miller's] hands were inside her pants." J.M. also stated that D.M. had told her father about Mr. Miller grabbing her belt loops. In addition, she explained that she had questioned her older daughter about the "popping" incident and that her older daughter had confirmed that she had been present during the incident and that Mr. Miller had not touched D.M.'s breasts. J.M. concluded by stating that she believed that D.M. was simply embarrassed about Mr. Miller's comments about the size of her pants.

Following a 43-minute recess, the hearing officer announced that she had concluded that Mr. Miller had violated the rules of his parole "based on the testimony of the State's witnesses here today that I feel is reliable proof." She also stated that she intended to recommend to the Board that Mr. Miller's parole be revoked. Between August 25 and September 25, 1997, three Board members signified their agreement with the hearing officer's recommendation, and on October 3, 1997, Mr. Miller was notified that the Board had concurred with the hearing officer's recommendation to revoke his parole. Mr. Miller sought administrative review of this decision and received word on November 21, 1997 that his request for review had been denied.

On December 12, 1997, Mr. Miller filed a petition for a common-law writ of certiorari in the Chancery Court for Davidson County. He asserted that the hearing officer had denied his right to due process by allowing the introduction of hearsay evidence which had not been established as being reliable and by not allowing confrontation of witnesses without the required finding of good cause. On April 22, 1998, the trial court filed an order denying Mr.

Miller's petition based on its finding that "the hearing officer did not exceed his [sic] authority or act arbitrarily, illegally or fraudulently in determining that good cause existed for not allowing the petitioner to confront the child witness." This appeal followed.

## II.

Prisoners do not have a right to be released from confinement prior to the expiration of their sentence. *See* Tenn. Code Ann. § 40-28-117(a) (1997); *Graham v. State*, 202 Tenn. 423, 426, 304 S.W.2d 622, 623-24 (1957); *Tarpley v. Traughber*, 944 S.W.2d 394, 395 (Tenn. Ct. App. 1996). Decisions to grant parole are discretionary and are solely the prerogative of the Tennessee Board of Paroles. *See* Tenn. Code Ann. § 40-28-116(a)(1) (Supp. 1998); *State ex rel. Ivey v. Meadows*, 216 Tenn. 678, 685, 393 S.W.2d 744, 747 (1965). These decisions may be reviewed using a common-law writ of certiorari, but the courts may not overturn them if they have been done according to law. *See* Tenn. Code Ann. § 40-28-115(c) (Supp. 1998); *Flowers v. Traughber*, 910 S.W.2d 468, 470 (Tenn. Crim. App. 1995). The scope of review available through a common-law writ of certiorari is extremely narrow. The writ may be used only to determine whether, in a particular case, the Board exceeded its jurisdiction or acted illegally, fraudulently, or arbitrarily; it may not be used to review the correctness of the Board's decision. *See Arnold v. Tennessee Bd. of Paroles*, 956 S.W.2d 478, 480 (Tenn. 1997).

The Board's decisions either to revoke or to rescind parole are also reviewable only through a common-law writ of certiorari. *See Sanders v. Tennessee Bd. of Paroles*, 944 S.W.2d 395, 397 (Tenn. Ct. App. 1996) (revocation of parole); *Daniels v. Traughber*, No. 01A01-9707-CH-00297, 1998 WL 221075, at *3 (Tenn. Ct. App. May 6, 1998), perm. app. denied (Tenn. Jan. 4, 1999) (recission of parole). Accordingly, we will review decisions to revoke parole to determine whether the Board exceeded its jurisdiction or acted illegally, fraudulently, or arbitrarily. We will not review the Board's decision simply to determine whether it is correct, and we will not grant relief if the decision was arrived at in a constitutional and lawful manner. *See Arnold v. Tennessee Bd. of Paroles*, 956 S.W.2d at 480; *Powell v. Parole Eligibility Review Bd.*, 879 S.W.2d 871, 873 (Tenn. Ct. App. 1994).

## III.

This appeal does not require us to decide whether Mr. Miller sexually abused D.M. The sole issue here involves the adequacy and fundamental fairness of the procedure employed by the Board to revoke Mr. Miller's parole. If we find that the procedure employed in this case comports with all applicable statutory and constitutional requirements,

then we must affirm the trial court's denial of Mr. Miller's petition for a common-law writ of certiorari. If, however, we find that the procedure was inconsistent with applicable statutory and constitutional requirements, then we must grant Mr. Miller relief. The appropriate relief is not to absolve him of the allegations against him but rather is to remand the case to the Board to afford Mr. Miller a constitutionally adequate parole revocation hearing.

## A.

We first address the necessary procedural ingredients for a constitutionally adequate parole revocation hearing. Because parole revocation proceedings are not criminal prosecutions, parolees facing the revocation of their parole are not entitled to the full panoply of procedural rights accorded to defendants in criminal trials. *See Pennsylvania Bd. of Probation & Parole v. Scott*, ___ U.S. ___, ___, 118 S. Ct. 2014, 2022 (1998); *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S. Ct. 2593, 2600 (1972). They are, nevertheless, entitled to certain minimum due process protections stemming from the state and federal constitutions, state law, and the Board's own rules. *See Wells v. Tennessee Bd. of Paroles*, 909 S.W.2d 826, 829 (Tenn. Ct. App. 1995).

The minimum due process protections afforded parolees facing the loss of their liberty should by now be well-known to the courts and the parole authorities. Chief Justice Burger has stated that they include:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Morrissey v. Brewer*, 408 U.S. at 489, 92 S. Ct. at 2604. Both this court and the Tennessee Court of Criminal Appeals have held that the Tennessee Board of Paroles must adhere to these procedural requirements. *See Jennings v. Traughber*, No. 01A01-9509-CH-00390, 1996 WL 93763, at *4-5 (Tenn. Ct. App. Mar. 6, 1996) (No Tenn. R. App. P. 11 application filed); *Young v. State*, 539 S.W.2d 850, 853 (Tenn. Crim. App. 1976).

These minimum standards reflect a preference for permitting parolees to confront and cross-examine their accusers; however, they also permit the Board's hearing officers to

dispense with confrontation and cross-examination for good cause. However, the State even concedes that parolees must be given "an opportunity to cross-examine adverse witnesses unless the hearing officer specifically finds good cause for not allowing confrontation." Thus, when good cause exists, hearing officers in parole revocation hearings may permit the introduction of letters and affidavits that, by their very nature, have not been tested by confrontation and cross-examination. *See Morrissey v. Brewer*, 408 U.S. at 489, 92 S. Ct. at 2604; *Sanders v. Tennessee Bd. of Paroles*, 944 S.W.2d at 397. The issue that remains to be decided concerns what must be proven to demonstrate good cause for denying a parolee the opportunity to confront and cross-examine adversary witnesses.

Good cause is not a precise standard, and there is no bright-line rule for determining whether good cause exists. The inquiry is factually driven and may, in large measure, depend on the nature and purpose of the evidence sought to be introduced. Thus, for example, persons who desire to express an opinion either favoring or opposing the revocation of parole based on the parolee's character, the nature of the parolee's underlying conviction, the parolee's institutional conduct, or the parolee's reputation in the community need not be subjected to confrontation and cross-examination because their statements are simply personal opinions. The Board receives these sorts of letters and communications every day, and it would add little to the integrity of the hearing process to require persons desiring to give opinions of this sort to appear in person at the revocation hearing to offer them.

Testimony establishing the grounds for revoking a parole should be treated more rigorously because it provides the basis for depriving the parolee of his or her liberty. Rather than being merely statements of personal opinion, this testimony is being offered to prove the truth of the matters contained in it. Accordingly, the requirements for its admission must contain reasonable safeguards to ensure that the testimony is truthful and accurate.

In the Anglo-American legal system, confrontation and cross-examination are the principal safeguards for assuring that testimonial evidence is true and accurate. Ever since the treason trial of Sir Walter Raleigh in 1603 in which Raleigh was convicted and executed based on the written confession of an alleged co-conspirator, our law has favored rigorous adversarial testing of testimonial evidence. *See Dutton v. Evans*, 400 U.S. 74, 86 n.16, 91 S. Ct. 210, 218 n.16 (1970). As Lord Chief Justice Hale noted in the seventeenth century, adversarial questioning "beats and boults out the truth much better than when the witness only delivers a formal series of his knowledge without being interrogated." Matthew Hale, *History of the Common Law* (1680), *quoted in* 5 John H. Wigmore, *Evidence in Trials at Common Law* § 1367, at 34 (Chadbourn rev. 1974).

This same preference for confrontation and cross-examination continues to be reflected in our modern decisions. Adversarial questioning can test a witness's (a) opportunity to ascertain the facts being testified to, (b) powers of perception and memory, (c) bias, interest, or prejudice, and (d) underlying character for truthfulness, as well as the completeness of the witness's account of situations or events. Thus, the Tennessee Supreme Court has emphasized that adversarial questioning can expose facts that permit the fact-finder to gauge a witness's reliability more accurately, *see State v. Howell*, 868 S.W.2d 238, 252 (Tenn. 1993), and that providing the fact-finder with an opportunity to observe how a witness testifies in the accused's presence has value that should not be easily dismissed. *See State v. Deuter*, 839 S.W.2d 391, 395 (Tenn. 1992); *see also* 5 John H. Wigmore, *Evidence in Trials at Common Law* § 1395, at 153-54 (Chadbourn rev. 1974).

Administrative proceedings such as parole revocation hearings, no less than civil or criminal judicial proceedings, involve a search for the truth. Thus, when presented with hearsay evidence to prove a parole violation, hearing officers must satisfy themselves either that the evidence is, by its very nature, inherently reliable and the type of information commonly relied upon by reasonably prudent persons, *see generally State v. Wade*, 863 S.W.2d 406, 409 (Tenn. 1993); Tenn. Code Ann. § 4-5-313(1) (1998), or that the evidence sought to be introduced has already been subjected to the same sort of adversarial questioning as live, in-person testimony. *See generally State v. Deuter*, 839 S.W.2d at 393. Other courts have applied substantially similar standards on parole revocation hearings. *See Belk v. Purkett*, 15 F.3d 803, 812-13 (8th Cir. 1994); *Farrish v. Mississippi State Parole Bd.*, 836 F.2d 969, 977-78 (5th Cir. 1988); *Ex parte Taylor*, 957 S.W.2d 43, 44-45 (Tex. Crim. App. 1997).

**B.**

We now turn to the procedure used to determine whether good cause existed for permitting the Board to prove its entire case against Mr. Miller using untested hearsay evidence. The hearing officer's decision rests on three grounds – D.M.'s age, the nature of Mr. Miller's alleged offense, and the hearing officer's subjective belief that the witnesses offering the hearsay testimony were "reliable." These reasons do not provide good cause for depriving Mr. Miller of his opportunity to test the credibility of D.M.'s statements.

In order to make a constitutionally adequate finding that good cause exists for dispensing with Mr. Miller's opportunity to confront or cross-examine D.M., the hearing officer should have considered three issues. First, whether D.M.'s out-of-court statements were inherently reliable and of the type that would be commonly relied upon by reasonable

persons in the conduct of their own affairs. Second, whether D.M.'s statements had been tested for veracity through adversarial questioning. Third, whether D.M. was suffering from such serious emotional distress that she would be unable to testify fully and truthfully if she were required to testify in Mr. Miller's presence. *See State v. Deuter*, 839 S.W.2d at 393-94.

## 1.
### THE INHERENT RELIABILITY OF D.M.'S STATEMENTS

There are three reasons why the current record does not support the hearing officer's conclusion that D.M.'s statements concerning Mr. Miller are inherently reliable. First, children's reports of sexual abuse are no longer perceived to be inherently accurate. Second, D.M.'s statements to the authorities are internally inconsistent. Third, D.M.'s statements to her parents are not consistent with her statements to authorities.

A belief prevailed at one time that children's reports of sexual abuse were inherently reliable because children would rarely persist in lying to authority figures about sexual activity and because children do not have sufficient knowledge about sexual activity to lie effectively.[5] This belief has now been tempered by two developments. First, experience has shown that a significantly large number of child sexual abuse reports turn out to be erroneous or unsubstantiated.[6] Second, concern exists that the techniques frequently used to interview children have further undermined the reliability of the children's statements.[7] In light of these developments, there is no empirical basis for treating children's testimony concerning sexual abuse as any more or less reliable than other types of testimony.

This record also contains indications that D.M.'s statements about Mr. Miller should not be taken at face value. The credibility of a witness who gives inconsistent statements is subject to question. *See Jones v. Lenoir City Car Works*, 216 Tenn. 351, 356, 392 S.W.2d 671, 673 (1965); *Dailey v. Bateman*, 937 S.W.2d 927, 930 (Tenn. Ct. App. 1996). D.M.'s

---

[5]*See, e.g., State v. Myatt*, 697 P.2d 836, 841 (Kan. 1985); Robert P. Mosteller, *Remaking Confrontation Clause and Hearsay Doctrine Under the Challenge of Child Sexual Abuse Prosecutions*, 1993 U. Ill. L. Rev. 691, 695; Judy Yun, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases*, 83 Col. L. Rev. 1745, 1751 (1983).

[6]*See Valmonte v. Bane*, 18 F.3d 992, 1003-04 (2d Cir. 1994); Christopher J. Sinnott, *When Defendant Becomes Victim: A Child's Recantation As New Discovered Evidence*, 41 Clev. St. L. Rev. 569, 579 (1993); Jacqueline Beckett, Note, *The True Value of the Confrontation Clause: A Study of Child Sex Abuse Trials*, 82 Geo. L.J. 1605, 1606-07, 1632 (1994) ("Beckett").

[7]*See Maryland v. Craig*, 497 U.S. 836, 868, 110 S. Ct. 3157, 3175 (1990) (Scalia, J., dissenting); *Felix v. State*, 849 P.2d 220, 243 (Nev. 1993); *State v. Matsamas*, 808 P.2d 1048, 1055 (Utah 1991)(Stewart, J., concurring); Beckett, 82 Geo. L.J. at 1636; Meredith Sopher, *The Best of All Possible Worlds: Balancing Victims' and Defendants' Rights in the Child Sexual Abuse Case*, 63 Fordham L. Rev. 633, 645-46 (1994).

statements concerning Mr. Miller are both internally and externally inconsistent. On March 4, 1997, she told investigators that Mr. Miller never touched her while she was in his bedroom; however, on August 12, 1997, she told Kim Brown that Mr. Miller had touched her breasts and vagina with both hands while she was in his bedroom looking for "rings for an African American project for school." In addition, her statements to the investigators concerning another incident when she stated that Mr. Miller put his hands inside her pants are inconsistent with her statements to both her mother and father that Mr. Miller grabbed a belt loop of her baggy pants, pulled them out, and told her that "[y]our pants are big enough for you and I to fit in."

## 2.
### THE CIRCUMSTANCES UNDER WHICH D.M. GAVE HER STATEMENTS

The record is likewise clear that the veracity of D.M.'s hearsay statements was never tested by any sort of adversarial questioning. The investigators conducted extremely informal interviews with the child. D.M. was never placed under oath. She was never asked if she understood the difference between telling the truth and telling a lie, and she was never cautioned about the importance of telling the truth. She was, however, congratulated by the investigators for making the statements. The investigators told her that they were "proud" of her for talking to them, that she "did the right thing" by talking with them, and that they were "going to take care of it." Mr. Miller's lawyer was never afforded an opportunity to be present when the investigators questioned D.M. or to ask her any questions at all. Under these circumstances, no conclusion can be drawn other than D.M.'s statements have never been tested for veracity using techniques similar to those that would have been employed had she testified at the parole revocation hearing.

## 3.
### D.M.'S ABILITY TO TESTIFY

The purpose of a fact-finding hearing is to seek the truth. Courts and legislatures have recognized that a fact-finder's ability to discover the truth may be undermined when a young victim of sexual abuse is so intimidated by her abuser that he or she is too fearful to talk in the abuser's presence. *See Coy v. Iowa*, 487 U.S. 1012, 1032, 108 S. Ct. 2798, 2809 (1988) (Blackmun, J., dissenting); Paula Hill & Samuel Hill, Note, *Videotaping Children's Testimony: An Empirical View*, 85 Mich. L. Rev. 809, 827 (1987); Diane K. Vaillancourt, Note, *State v. Thomas: Face to Face With Coy and Craig – Constitutional Invocation of Wisconsin's Child Witness Protection Statute*, 1990 Wis. L. Rev. 1613, 1614. Accordingly, they have established and approved procedures permitting victims of child sexual abuse to

testify outside of the alleged abuser's presence as long as there has been a finding that the child would be unable to communicate otherwise. *See Maryland v. Craig*, 497 U.S. at 857, 110 S. Ct. at 3170; *State v. Deuter*, 839 S.W.2d at 393-94; *Ex parte Taylor*, 957 S.W.2d at 45-47; *see also* 18 U.S.C.A. § 3509(b)(1)(B)(i), (ii), (iv) (West Supp. 1998); Tenn. Code Ann. § 24-7-120(a)(3) (Supp. 1998).

The evidence concerning D.M.'s ability to testify in Mr. Miller's presence is sketchy. Ms. Reed informed the hearing officer that D.M. declined to discuss Mr. Miller and refused to give a videotaped statement when she, Linda Brown, and Ms. Hodo talked with D.M. and J.M. on July 23, 1997. Even though Kim Brown did not attend the parole revocation hearing, the record also contains her hearsay statements that D.M. was "scared and tearful" on August 12, 1997 and that she "appeared to be very confused and scared if she would have to testify . . . [against] Mr. Miller."

There are two possible explanations for D.M.'s reticence in July and August 1997. First, her conduct could indicate that D.M. remains so fearful of Mr. Miller that she would be unable to testify fully and truthfully in his presence. Second, her conduct could indicate that D.M. realizes that her statements regarding Mr. Miller were mistaken or exaggerated. D.M. should not be permitted to avoid confronting Mr. Miller unless the first explanation is correct. But even if the first explanation is correct, it does not provide a basis for concluding that Mr. Miller, through his lawyer, was not entitled to an opportunity to test D.M.'s credibility under proper circumstances.

## IV.

We are only now beginning to realize that child sexual abuse is a major and growing problem in our society.[8] This abuse permanently affects its victims' lives, and its societal costs are staggeringly high.[9] Yet, despite the horrendously repulsive nature of the offense, these proceedings present sensitive and difficult procedural problems because of the competing interests at stake. Like judicial proceedings in which child sexual abuse is at

---

[8]*See* Donald C. Bross, *Terminating the Parent-Child Relationship As a Response to Child Sexual Abuse*, 26 Loy. U. Chi. L.J. 287, 289 (1995) (stating that five studies conducted between 1940 and 1978 indicate that from 17% to 28% of middle class women reported being the victims of sexual abuse); Note, *The Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations*, 98 Harv. L. Rev. 806, 806 (1985) (stating that as many as one in five females and one in eleven males are sexually abused as children).

[9]*See* Cynthia G. Bowman & Elizabeth Mertz, *A Dangerous Direction: Legal Intervention in Sexual Abuse Survivor Therapy*, 109 Harv. L. Rev. 549, 552 (1996); Lynne Henderson, *Without Narrative: Child Sexual Abuse*, 4 Va. J. Soc. Pol'y & L. 794, 538 (1997).

issue, administrative proceedings must be conducted according to a fundamentally fair legal procedure.

In this case, the hearing officer acted arbitrarily and illegally by failing to apply the proper standards for determining whether good cause existed for preventing Mr. Miller from confronting and cross-examining D.M. To strike an appropriate balance between Mr. Miller's rights of confrontation and cross-examination and the Board's desire to shield D.M. from the trauma and stress of testifying, the hearing officer should have first determined whether D.M. was unable to testify completely and truthfully in Mr. Miller's presence. If D.M. was completely unable to testify in Mr. Miller's presence, then the hearing officer should have determined whether her testimony was inherently reliable or whether it had already been subjected to adversarial questioning substantially equivalent to cross-examination in court. Unless the hearing officer determined from all the circumstances that D.M.'s testimony was inherently reliable, Mr. Miller should have been afforded an appropriate opportunity to test the credibility of D.M.'s accusations.

## V.

The order dismissing Mr. Miller's petition for a common-law writ of certiorari is reversed and the case is remanded to the trial court with directions to enter an order granting the writ of certiorari and remanding the proceeding to the Board with directions either to provide Mr. Miller forthwith with a proper parole revocation hearing or to restore Mr. Miller to his status as a parolee. We tax the costs of this appeal to the Tennessee Board of Paroles.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:

_____
BEN H. CANTRELL,
PRESIDING JUDGE, M.S.

_____
WILLIAM B. CAIN, JUDGE

-13-